**Abelardo Llamas GARCIA, Appellant,**

**v.**

**The STATE of Oklahoma, Appellee.**

**Nos. A–16210, A–16400.**

Court of Criminal Appeals of Oklahoma.

June 21, 1972.

As Modified on Rehearing Oct. 26, 1972.

Earl W. Wolfe, Tulsa, and Curtis A. Parks, Appellate Public Defender, Tulsa County, for appellant.

Larry Derryberry, Atty. Gen., Raymond Naifeh, Asst. Atty. Gen., for appellee.

BUSSEY, Presiding Judge:

Appellant, Abelardo Llamas Garcia, hereinafter referred to as defendant, was charged, tried and convicted in the District Court of Tulsa County, Oklahoma, for the offense of Murder; his punishment was fixed at death, and from said judgment and sentence, timely appeals have been perfected to this Court and consolidated for the purpose of this Opinion.

At the trial, Carl Morris testified that on December 8, 1969, he was the lessee of two service stations: one located at 2502 West Skelly Drive and the second at Crystal City in Tulsa. He testified that Jimmy Bingham, his sixteen-year-old next-door neighbor, worked for him on a part-time basis. He testified that Jimmy usually worked at the Crystal City station but on December 8, 1969, he filled in for another employee at the West Skelly Drive station. He went by the Skelly Drive station at approximately 5:00 in the afternoon and Jimmy was on duty. He returned to the station at about 11:30 p. m. and observed an off-duty police officer, Alvin Jones, at the station. He had a conversation with Officer Jones and subsequently began to look for Jimmy. He found Jimmy Bingham dead on the ground a few feet away from the back of the station.

Carl Morris further testified that he first met the defendant at the Crystal City station in approximately November 1969.

At the time he met the defendant, Jimmy Bingham was working at the Crystal City station. The defendant subsequently worked for him several nights at the station located at West Skelly Drive. After finding Jimmy's body, he observed the inside of the station and found approximately two hundred to two hundred fifty dollars was missing from the cash register.

Officer Walker testified that on the evening in question, he was assigned to patrol an area in the southwestern part of the City of Tulsa. He testified that he first drove past the Pacer-Fina Station on West Skelly at approximately 9:00 p. m. He returned at approximately 10:45 p. m. and observed a person wearing a dark brown coat inside the station. At approximately 11:30 p. m. he was summoned to the station and had a conversation with Officer Alvin Jones. After talking to Jones, he proceeded to the rear of the station and observed a young man lying on the ground wearing white jeans and a brown jacket. He testified that there was a similarity between the colors of the jackets that the young man he saw earlier in the evening was wearing to the young man he observed on the ground. He examined the body and the person showed no signs of life. He testified that the lighting condition at the rear of the station was poor.

John Pierce testified that he resided at 2410 West 50th in Tulsa, which was a little more than a city block from the Pacer-Fina Service Station. On the evening in question, after bowling and shopping, he returned to his home some time after 11:00 p. m. After entering the house he heard two gunshots. He looked at his watch and it was 11:10 p. m. Thereafter, he went to bed.

Alvin Jones testified that on the evening in question he was employed as a police officer but was off-duty. He pulled into the Pacer-Fina Service Station at approximately 11:20 p. m. to purchase gas and because of a low tire. He waited for several minutes for the attendant and when no one came, started to leave. He made a U-turn and pulled back in front of the office part of the service station. He went inside the office and observed the cash drawer was open. He called out and no one answered. After looking in the storage room and finding no one, he used the pay telephone and called the police dispatcher. While checking around the outside of the building, he discovered a body lying on the ground behind the station. He checked the body for vital signs and did not find any. There was a puncture wound in the left cheek portion of the face of the body. The hands were still in the jacket pockets of the young victim. He returned to the office part of the station and again called the police dispatcher.

Eugene Wade testified that he operated a pawn shop in the City of Tulsa. On December 6, 1969, he sold the defendant a .22-caliber pistol and some shells. He identified State's Exhibit Eleven as the pistol which the defendant purchased. Defendant signed a form "A. Garcia" and placed his fingerprints on the form which was mailed to the police department. He testified that he had done business with the defendant before and that on December 8, 1969, the defendant pawned a watch and some records for eight dollars ($8.00).

June Heustis testified that on the day in question, she was employed at the Eldorado Bar as a bar maid. On December 6, the defendant asked her if she had a large purse and dropped a gun and some shells into her purse. Defendant returned to the bar later that afternoon and asked her for the gun which she returned to him. On December 8, the defendant was in the bar when she went to work at 4:00 p. m. He stayed until 6:00 p. m. and left, returning approximately 45 minutes later. He played pool with Dude Wiley and Roy Sullivan and again left at approximately 10:00 p. m. He came back to the bar at approximately 11:30 p. m. and ordered a glass of beer. Defendant asked her for $2.00 worth of quarters and made a telephone call. After completing the telephone call, he finished

drinking his beer and left the bar saying, " 'I will see you on Thursday. I am going to Texas.' "

Roy Sullivan testified that he was in the Eldorado Bar on the evening in question. He arrived at approximately 8:30 p. m. and shot one or two games of pool with the defendant. The defendant left at approximately 10:15 or 10:30 p. m. and came back about a quarter till 12. He ordered a beer and made a telephone call to San Antonio, Texas. After finishing the telephone call, defendant said "he bought himself an extra 24 hours." As defendant got up to leave, Sullivan saw a gun sticking in the defendant's belt on the right-hand side. Upon cross-examination, Sullivan denied ever having made the statement to the defendant's attorneys that the defendant left the bar around 8:45 to 9:00 p. m.

James Tilley testified that he was the defendant's roommate at the Cove Apartments. He first observed the defendant on the day in question at about 11:00 in the morning. Defendant was looking at some insurance papers and had a .22-caliber pistol laying beside him. Defendant stated that he had gotten the gun from his brother. Tilley identified State's Exhibit Eleven as the same gun he observed in the apartment. He and the defendant had a conversation for several hours and the defendant stated that he needed some money and was going to pull a job by robbing the Fina station on the Skelly By-Pass. Tilley told the defendant it would be silly to pull the job and that he might get five or ten years for it. The defendant left the apartment at approximately 3:00 in the afternoon, taking the gun with him. Tilley testified on cross-examination that he had previously been voluntarily committed to the Eastern State Hospital at Vinita; and that he had been convicted of drunk driving and several traffic offenses.

James Randolph testified that the defendant came to his used car lot shortly after he opened on the morning of December 9. The defendant purchased a 1967 two-door Ford for $150.00, paying $125.00

cash and writing a contract for the unpaid balance of $25.00.

Clete Hunt testified that he was employed as a police officer in Cleveland, Oklahoma. On December 11, 1969, he was working from 11:00 p. m. until 7:00 the following morning. While on duty, he observed the defendant driving a 1967 Ford automobile on Highway 64 and Intersection 99. He followed the defendant and eventually stopped him. He placed the defendant under arrest and transported him to the police station. Upon searching the defendant, he recovered some .22-caliber shells from the defendant's pocket. Defendant's car was impounded and towed to the Cleveland Police Station.

Maurice J. Stack testified that he was a special agent with the Federal Bureau of Investigation. He performed certain tests with State's Exhibit Eleven and certain bullets which were submitted for examination. There were not sufficient microscopic characteristics remaining on either of the bullets to positively identify them as having been fired from State's Exhibit Eleven. He testified on cross-examination that the weapon was a fairly common type of weapon and estimated there were approximately 200,000 imported German type weapons in the United States. He further testified that there were somewhere between 24 and 36 million rounds of the similar type ammunition manufactured per year in the United States.

Detective Gus Jones testified that after receiving a call, he, accompanied by Detectives Vauss and Campbell, proceeded to the Cleveland Police Department, whereupon they observed the defendant in custody. The court thereupon conducted an evidentiary hearing outside the presence of the jury, whereupon Officer Jones testified that he advised the defendant of his constitutional rights. The defendant thereupon signed a waiver of search for his vehicle. The jury was recalled to the courtroom and Officer Jones testified that after obtaining a search waiver from the defendant he searched the defendant's ve-

hicle and found the .22-caliber pistol under the dash of the vehicle. He testified on cross-examination that he was involved in the investigation of the homicide at the scene and had been to the Cove Apartments attempting to find the defendant.

Detective Vauss' testimony did not differ substantially from the testimony of Detective Jones.

Officer Putnam testified that he assisted in the investigation and checked the amount of time it took to walk from the service station to the apartments and the bar.

Officer Goodenough testified that he processed State's Exhibit Eleven for fingerprints and was unable to obtain any latent fingerprints. He identified the various exhibits as photographs which he made at the scene.

Officer Harrison identified two slugs which he received from the hospital from Dr. Lowbeer, the Pathologist.

The parties stipulated that Officer Euells would testify that he submitted the slugs and the weapon to the Federal Bureau of Investigation's laboratory in Washington, D. C.

Dr. Lowbeer testified that he conducted a post mortem examination on the body of Jimmy Ray Bingham. He testified that he observed an entrance wound to the left of the left eye which was fired at a fairly close range. He found a second entry wound behind the left ear. He testified that either of the two wounds could be considered as a fatal wound. In his opinion, the shot behind the left ear was probably fired first. He removed the two shells from the head of the victim and turned them over to Officer Harrison.

Anna Castle testified first at an evidentiary hearing that she was a passenger in a 1967 Chevrolet which stopped at the Pacer-Fina Service Station at approximately 11:00 to 11:15 p. m. She testified that she was able to get a good look at the person who serviced their car. On cross-examination she testified that she viewed a lineup on December 13, and identified the defendant as the person who was at the service station. She testified that there were five individuals in the lineup and that they were mostly of either Indian or Mexican descent. She testified that the identification of the defendant was made because of her observations at the service station rather than the observations at the lineup.

Officer Griffith was called by the defendant at the evidentiary hearing and testified that he supervised a lineup on December 13, 1969. He identified a photograph of the lineup.

The defendant testified at the evidentiary hearing that he was called out of his cell on the morning of December 13, and told that he was going to be in a lineup. He testified that the District Attorney and another officer came in and asked him if he wanted to sign a waiver for his right to have an attorney present at the lineup. He told the District Attorney that it "didn't matter to me." Wherein the District Attorney asked him if he knew his rights and he said, " 'Well, I think I do anyway.' " Whereupon the District Attorney stated, " 'Well, it didn't make any difference whether you sign the waiver or not, I am going to put you in the lineup this morning.' " (Tr. 991) Defendant testified that he asked the District Attorney when he would be able to get an attorney and was advised that he would be seeing one later that day. He was again asked if he wanted to sign a waiver for the lineup and he asked if he could make a telephone call. The District Attorney again stated that it didn't make any difference whether he had a lawyer or not; that he was going to be put in a lineup. He subsequently signed a waiver.

The parties stipulated that Officer Gatlin would testify as to the names and descriptions of the persons that were in the lineup and further stipulated as to the names of the persons who viewed the lineup. The trial court thereupon overruled the motion to suppress the identification.

Anna Castle testified in open court that she was a passenger in a vehicle which

stopped at the service station at approximately 11:15 p. m. She identified the defendant as the person who serviced the car, and testified that the lighting was sufficent enough for her to see his face.

For the defense, Felicia Garcia, the defendant's sister, testified that on the 8th of December 1969, she had a telephone conversation with the defendant about 11:00 p. m. She testified that during this period of time she sent mail to the defendant at Cleveland, Oklahoma.

Eugene Reed testified that for the last three months he had been an attendant at a service station on West Skelly in Tulsa. He testified that it varied from night to night whether or not he would get a large number of one dollar bills.

June Heustis was recalled by the defendant and testified that she was present on May 12, 1970, when a conversation was held between Roy Sullivan and the defendant's attorneys. Sullivan told the attorneys that the defendant left the bar around 8:30 or 8:45 p. m. on the evening in question and returned about 10:30 or fifteen till 11 p. m. On cross-examination she testified that to the best of her knowledge Sullivan was in error as to the times he told the attorneys.

The first proposition asserts that the trial court erred in overruling defendant's original and amended applications for a change of venue. It has long been the law of this State that the granting of the change of venue is discretionary with the trial court and this Court will not reverse a ruling of the trial court denying a change of venue unless it is made clearly to appear that there has been an abuse of this discretion. Tegeler v. State, 9 Okl.Cr. 138, 130 P. 1164 (1913). We have carefully examined the record and are of the opinion that the trial court did not abuse its discretion in denying defendant's applications for change of venue. We observe that the trial court went to great extremes to insure that the defendant received a fair and impartial jury. Each juror was examined individually and the selection of the jury

took three days. Of the forty-six potential jurors examined, only two had what would be considered a fixed opinion as to defendant's guilt. In Pate v. State, Okl.Cr., 361 P.2d 1086, we stated in the fourth syllabus:

"The ease with which a jury was obtained and qualified on their voir dire to try the cause before the application for a change of venue is denied is of some probative force to show that a change of venue is not necessary to insure the defendant a fair trial."

In the instant case the defendant reurged his motion for change of venue after the selection of the jury. The court in denying the application stated:

"I feel after spending three days selecting a jury in this case, the method we did select, it went quite deeply into the knowledge of the jurors which they had regarding this case, and I feel after discussing this case with all of the 40 some jurors we empaneled, we have selected a jury which is in a position to give the defendant a fair trial, and I would overrule the motion for change of venue." (Tr. 693)

We concur with the trial court's finding and therefore find this proposition to be without merit.

The second proposition contends that the trial court erred in failing to excuse prospective juror Roy L. Bogle for cause upon defendant's challenge. It was established on voir dire examination that the prospective juror Bogle had on occasion, for a period of two months, purchased gas approximately once a week at the service station and knew the victim, Jimmy Bingham, on a casual basis. He further testified that he, on occasion, observed Bingham at the bowling alley where Bingham watched people bowl. The only conversation he had with Bingham was just to say hello to him. He further testified that he was acquainted with a witness for the prosecution, Robert Pierce, and had been for approximately one year. The two were good friends and played

cards together. He testified that he had discussed with Pierce what Pierce's testimony would be concerning the fact that he heard a shot. Defendant challenged the juror for cause on the ground that he knew so much about the case it would imply bias. Although it would have been the better practice for the trial court to have excused the juror for cause, that refusal to do so does not constitute reversible error. It is apparent that the trial court relied on the prospective juror's responses that he could be a fair and impartial juror. Examples of the juror's responses are as follows:

"Q. The fact that you are acquainted with this Jimmy Bingham, would it make it difficult for you to serve as a juror in this case?

"A. No, sir." (Tr. 298–299)

" * * *

"Q. Do you feel that you could give both the State and the defendant a fair trial in this case?

"A. I do." (Tr. 300)

" * * *

"Q. Knowing him [Robert Pierce] and having discussed this with him, would this tend to influence you, make you give more credit to his testimony than you would other witnesses, just the fact that you know him?

"A. No, sir, it wouldn't.

"Q. And you are satisfied that you could give the defendant a fair and impartial trial:

"A. Yes, sir, I do." (Tr. 301–302)

" * * *

"Q. Do you feel that you give [sic] Mr. Garcia the same trial that you would any other person that was here on trial?

"A. Yes, sir." (Tr. 304)

" * * *

"Q. Would you have any hesitancy in bringing back a verdict of not guilty if the State failed to prove his guilt beyond a reasonable doubt?

"A. No, sir." (Tr. 307)

" * * *

"Q. Mr. Bogle, have you heard anybody express an opinion as to the guilt or innocence of Abe Garcia in this case?

"A. No, sir." (Tr. 313)

" * * *

"Q. Now if John Pierce, or Ron Pierce, is called by the State here as a witness, wouldn't you be inclined to give his testimony a little more weight than you would anybody else that came up here?

"A. No, sir." (Tr. 316–317)

We further observe that the juror Bogle was the defendant's next peremptory challenge. In Koonce v. State, Okl.Cr., 456 P.2d 549, in dealing with a similar problem, we stated:

"Furthermore, it is abundantly clear that the defendant could not have been prejudiced by this ruling of the trial court since the prospective juror McCormick was peremtorily [sic] challenged and excused by defense counsel and did not serve on the jury which heard defendant's case. It is interesting to note that when defense counsel's peremptory challenge of McCormick was questioned, he stated: 'Let the record show that defendant excused this juror because he was represented by the assistant district attorney's father in some legal matters.' (CM 387).

"Title 22 O.S.1961, § 662, provides in relevant part:

'* * * no person shall be disqualified as a juror by reason of having formed or expressed an opinion upon the matter or cause to be submitted to such jury, founded upon rumor, statements in public journals, or common notoriety, provided it appears to the court, upon his declaration, under oath or otherwise, that he can and will, notwithstanding such opinion, act impartially and fairly upon the matters to be submitted to him. The challenge may be oral, but must be entered upon the minutes of the court.'

"From a complete search and examination of the record we find that none of the jurors who ultimately heard defendant's case, were selected inconsistent with the requirements of this statute, and therefore conclude that the defendant was tried by a fair and impartial jury."

■ Defendant's third, fourth and fifth propositions assert that the trial court erred in excusing prospective jurors Larry Johnson, Harold Jones and Jackie Payne for cause upon challenge by the State which was improper under the standards set forth in Witherspoon v. Illinois, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776. We have carefully examined the voir dire examination of the three jurors and are of the opinion that the trial court properly excused the jurors for cause when they stated that they could not consider the death penalty at all. Dealing with a similar question in Koonce v. State, supra, we stated:

"We thus observe the critical question necessary before a prospective juror can be excused on a challenge for cause is whether in a proper case they would consider or agree to a verdict which imposes death as the penalty. Mere opposition to the death penalty, whether it arises from a religious or conscientious scruple, or any other source, does not constitute cause for challenge. Rather it must appear prospective jurors are unable to return a death sentence no matter what may be the facts of the case. * * *"

We further stated:

"In keeping with the Witherspoon decision, it is apparent that the State is entitled to a jury which is neutral on the subject of penalty and it may challenge for cause a juror who would never consider returning a verdict of death. It is clear that the State is still entitled to a jury that is capable of imposing the death penalty. Witherspoon v. Illinois, 88 S.Ct., at 1776; New Jersey v. Madden [Mathis] [52 N.J. 238] 245 A.2d [20] at 23."

The potential juror Johnson responded on voir dire examination as follows:

"Q. I understand you could not say because you haven't heard the facts, but is there anything about your religious beliefs, or your conscientious belief that would tell you that under no circumstances could I give some one the death penalty?

"A. No, I don't know—religious I guess—

"Q. What I am saying, would it depend on the case? Could you visualize a case where you could give somebody the death penalty depending on the facts and circumstances?

"A. I don't think that I could.

"Q. You don't feel that you could under any circumstances give a death penalty?

"A. No.

"Q. Do you feel that you would automatically vote against the death penalty regardless of the circumstances that were presented on trial, you just wouldn't consider it in any manner?

"A. No.

"Q. You are saying you would not consider the death penalty at all?

"A. No." (Tr. 115–116)

The potential juror Jones, after first stating that he could consider the death penalty, further responded to the following questions:

"Q. You have indicated to me before—I asked if you could in a proper case impose the death penalty.

"A. What did I tell you on that? I told you that I don't.

"Q. I didn't believe that you would. I may be wrong. I asked you if you had any conscientious or religious scruples against the—

"A. Yes.

"Q. —against imposing the death penalty in a proper case.

"A. I said no. Is that what I said?

"Q. Right.

"A. I didn't understand exactly what you were talking about.

"Q. You are advising me at this point that you would not under any circumstances consider giving the death penalty?

"A. No, I wouldn't.

"Q. You wouldn't, regardless of the facts or circumstances, no matter how severe a case it would be, you couldn't consider the death penalty?

"A. I don't think I could.

"Q. Do you feel in view of your attitude toward the death penalty, would this prevent you from making an impartial decision as to the defendant's guilt or innocence?

"A. No.

"Q. You feel that you could find him guilty or innocent regardless of the fact that the law will let you consider both the death penalty or life imprisonment?

"A. Yes.

"Q. But you would automatically vote against the death penalty. Is this correct?

"A. Yes, that is correct.

"Q. You wouldn't consider it in any manner?

"A. Death?

"Q. The death penalty.

"A. I don't think I could.

"Q. Now, you say you don't think you could.

"A. Yes.

"Q. Either you could or you couldn't.

"A. Consider death?

"Q. Yes.

"A. No." (Tr. 108–109)

Prospective juror Jackie Payne's testimony on voir dire vacillated whether or not she could impose the death penalty in an extreme case. She testified in part as follows:

"Q. Do you feel at this point that if the facts were such that it was an extreme case or a proper case, that you could do this?

"A. When we come right down to it I don't think I could say I could. I don't believe I could say anybody should be put to death.

"Q. You don't feel then in any case you would be able to bring back a verdict sentencing a man to death?

"A. No, I don't." (Tr. 547)

She further testified in response to the following question by the court:

"Q. Would you automatically regardless of the facts presented here, would you automatically vote against—say you found the defendant guilty of murder, regardless of what the facts that were presented, would you automatically vote against the imposition of the death penalty?

"A. Yes, sir. I believe I would vote for life imprisonment. I could not vote for the death penalty.

"Q. You would do that automatically regardless what the facts were?

"A. If he were found guilty I would vote for life imprisonment, but I wouldn't vote for the death penalty.

"THE COURT: Mrs. Payne, I will excuse you for cause." (Tr. 549–550)

We therefore conclude that defendant's propositions three, four and five are without merit and hold that the examination of the prospective jurors was consistent with the requirements of the Sixth and Fourteenth Amendments of the United States Constitution as defined in Witherspoon v. Illinois, supra, by the United States Supreme Court.

■ The sixth proposition contends that "the trial court erred in allowing the District Attorney, over defendant's objection, to inquire of prospective jurors as to whether they 'could and would' impose the death penalty in a proper case." Defendant argues in his brief that the District Attorney was "therefore demanding that the jurors commit themselves as to whether or not they *would* impose the death penalty without informing them that they had the absolute discretion in determining

whether or not such a penalty should be given." Defendant further states in his brief:

"During the voirdire [sic] of prospective jurors the District Attorney invariably asked of each and every venireman examined a question similar to the following question asked of prospective juror Smith at page 71 of the record:

'Q. If you feel at that time, after you have heard all this in this case, after finding him guilty beyond a reasonable doubt, that the appropriate and proper punishment in this case is death, *could you and would you* vote for that punishment?' "

We need only to observe that the defendant did not object to the question asked of the prospective juror Smith nor did he object to a similar type question asked to other jurors and attempts to raise the question for the first time on appeal. We, therefore, conclude that the question was not properly preserved and is not properly before this Court.

■ The seventh proposition that "the trial court erred in imposing the sentence of death by electrocution since said sentence was not authorized by the statutes of the State of Oklahoma and since the imposition of the punishment of death by means of electrocution would violate defendant's right to be free from cruel and unusual punishments." In 1951, the Legislature revised Chapter 113 of the laws of 1913 as follows:

"The punishment of death must be inflicted by the administration of a lethal gas. Provided however, the punishment of death must be inflicted by electrocution until such time as a lethal gas execution chamber is available. R.L.1910, § 5981; Laws 1913, ch. 113, p. 206, § 1; Laws 1951, p. 63, § 1." 22 O.S., § 1014.

Under this same Act the Legislature appropriated $14,000.00 for the purpose of building a lethal gas execution chamber and allowed a time period of two and one-half years after the passage of the Act and could be contracted against and expended. Defendant, in his brief, argues: "Apparent-

ly, the Oklahoma Legislature never saw fit to act again concerning the construction of such a chamber. It might well be argued, therefore, that the State of Oklahoma has, by its enaction, abolished the death penalty in Oklahoma." In Hathcox v. Waters, 94 Okl.Cr. 286, 234 P.2d 950, decided on August 1, 1951, the Court stated in syllabus two:

"It is determined from the evidence that a lethal gas execution chamber is not yet available at the Oklahoma State Penitentiary, McAlester, and enrolled Senate Bill 228 of the last or 23rd Legislature, Tit. 22 O.S.1941 § 1014, is therefore not yet effective as provided by the very terms of the Act. Until said Act becomes effective, the infliction of the death penalty must be by electrocution."

Despite the intervening twenty years from the *Hathcox* opinion, we are of the opinion that the holding in *Hathcox*, supra, is still controlling and that it clearly was not the intent of the Legislature to abolish the death penalty when it set a time limit for the expenditure of moneys to build a lethal gas execution chamber. We reaffirm the holding of *Hathcox*, supra, to the extent that until such time as a lethal gas execution chamber is available, the punishment of death must be inflicted by electrocution.

■ Defendant further argues under this proposition that the judgment and sentence which provided for the infliction of the death penalty by means of electrocution is illegal and void as it constitutes a cruel and unusual punishment in violation of defendant's rights under the Constitution of the United States and of the State of Oklahoma. In dealing with a similar proposition in Watts v. State, Okl. Cr., 487 P.2d 981, we stated:

"The defendant's final proposition alleges that a sentence of death constitutes cruel and unusual punishment in violation of the Eighth and Fourteenth Amendments of the Constitution of the United States. In support of this proposition he presents five arguments. We note that he does

not support these arguments with citations of authority.

"We have carefully examined each of these final arguments and find nothing new therein to support his proposition that the death penalty is cruel and unusual punishment. We have previously held in Gaddis v. Page, supra [1], that the imposition of the death penalty is not cruel and unusual punishment. (See 24B C.J.S. Criminal Law § 1978, p. 555.) We are of the opinion that the defendant's last proposition is without merit."

■■■ The eighth proposition contends that the "trial court erred in refusing to permit cross-examination of witness Roy M. Sullivan, Jr., upon prior inconsistent extra judicial statements which provided defendant with an alibi and in denying defendant's offer of proof as to the nature of said testimony." The witness Sullivan testified on direct and cross-examination that the defendant left the bar at around 10:15 to 10:30 p. m. and returned at about a quarter to twelve. Sullivan was asked on cross-examination if he had ever made the statement that the defendant left the bar around 8:45 to 9:00 p. m., and responded, "Not to my knowledge, no, sir." Sullivan was then asked if he had ever made the statement that the defendant returned to the bar between 10:30 and 10:35 p. m., to which question an objection was sustained. The defendant was then asked, "Mr. Sullivan, do you remember the day of May 12, 1970, when Mr. Gaskill and I talked to you—," to which an objection was again sustained. Defendant thereupon made an offer of proof to the effect that if the witness was permitted to testify that he would testify that on the 12th of May 1970, he had a conversation with Mr. Wolfe and Mr. Gaskill in the Cove Apartments in Tulsa and that he told the defense attorneys that the defendant left the bar between 8:45 and 9 p. m. on the evening in question and returned to the bar between 10:30 and 10:45 p. m. The trial court denied the offer of proof. During the defendant's case in chief

he recalled June Heustis who testified that she was present at the Cove Apartments when the defendant's attorneys, Wolfe and Gaskill, talked to the witness, Sullivan. She testified that Sullivan told the attorneys that defendant left the bar on the evening in question at around 8:30 to fifteen to nine and that he returned about 10:30 or fifteen to eleven. On cross-examination she testified that to her knowledge the witness, Sullivan, was in error as to the times he told the attorneys. We are of the opinion that the court erred in not letting the defense proceed to cross-examine the witness, Sullivan, as to the prior inconsistent statements. Although we are of the opinion that the same does not constitute reversible error in that he presented impeachment testimony through June Heustis which met his offer of proof. In Blanck v. State, 14 Okl.Cr. 339, 169 P. 1130, we stated:

"*It is also contended that the court erred in refusing to permit the counsel for plaintiff in error to cross-examine the state's witness,* T. E. Wyly, *with reference as to whether or not there was any agreement or common understanding between said witness and the plaintiff in error on the day of the sale or prior thereto, to secure the execution of the check upon which this prosecution is based, by false or fraudulent representations to the prosecuting witness,* Thompson Charles. *We are of the opinion that the court's ruling in this respect was erroneous, but whatever error was committed was cured by plaintiff in error's own act in placing said* T. E. Wyly *upon the witness stand in his own behalf; said* Wyly *testifying fully and favorably to the plaintiff in error in respect to said matter.* In Rogers v. State, 9 Okl.Cr. 277, 131 Pac. 941, this court held:

'The admission or exclusion of testimony which, in the light of subsequent developments during the trial, indicates conclusively that no injury did or could have resulted is not ground for re-

---

1. Gaddis v. Page, Okl.Cr., 455 P.2d 699.

versal of a judgment.' " (Emphasis added)

 Defendant further argues under this proposition that the court erred in overruling the motion for new trial upon grounds of newly discovered evidence based upon the affidavit of Roy Sullivan. Sullivan's affidavit reflects that he was in extreme pain at the time of the trial and that his testimony as to the time the defendant left the bar and returned to the bar was in error. We are of the opinion that the trial court properly overruled the motion for new trial on the grounds that the same did not constitute newly discovered evidence and was known to the defendant's attorneys at the time of trial.

 The next proposition asserts that the trial court erred in overruling defendant's motion to suppress the in-court identification made by the witness, Anna Castle. Defendant argues that he was coerced by the District Attorney into signing the waiver of his right to be represented by counsel at the lineup. We do not deem it necessary to discuss whether or not the defendant was coerced into signing the waiver form. We have carefully examined the testimony given at the evidentiary hearing and are of the opinion that the lineup was conducted in substantial compliance with the procedures set forth in Thompson v. State, Okl.Cr., 438 P.2d 287. Defendant was advised of his right to be represented by counsel at the lineup. The witness, Anna Castle, was advised of the purpose of the lineup and the officers did not single out the defendant or suggest directly or indirectly that he was the person being sought. The other people participating in the lineup were of the same general weight, height, color, and race, and the defendant was not clothed in such a manner as to attract special attention to him. The names of the persons participating in the lineup were recorded and preserved, together with the names of the officers conducting the lineup. No other witness was present at the time the witness, Anna Castle, viewed the lineup and she did not converse with other witnesses with reference to the lineup before viewing the same. Pictures of the lineup were taken and admitted into evidence. The lineup was conducted at 10:00 in the morning and records of the manner and mode of conducting the lineup and names and addresses of the various persons who viewed the lineup were prepared and preserved. We are of the opinion that the trial court did not err in considering the totality of the circumstances in ruling that the in-court identification by the witness was not tainted. We, therefore, find this proposition to be without merit.

 Defendant filed a supplemental brief wherein he asserts that the trial court erred in sustaining the State's objection to his offer of proof concerning the telephone conversation had between he and Felicia Garcia. Defendant offered to prove that Felicia Garcia would testify that, when the defendant called her on the evening in question, he told her that his arrival in San Antonio for a visit was being delayed twenty-four hours and that as a result of this conversation with defendant, Felicia Garcia called her mother the next day and told her that the defendant would be about twenty-four hours late arriving in San Antonio. The record reflects that Felicia Garcia was asked the following question on direct examination:

"Q. Did you have a conversation with Abe at that time?

"A. Just that he was—

"MR. FALLIS: If it please the Court, we object to a hearsay statement by this witness; he is indirectly doing what cannot be done directly." (Tr. 1028)

The witness was further asked on direct examination:

"Q. And what did you relate to your mother?

"MR. FALLIS: I object to that as a self serving declaration on the part of the witness.

"THE COURT: Sustained.

"Q. (By Mr. Wolfe) What did you tell your mother?

"MR. FALLIS: I object to that on the same basis.

"THE COURT: Sustained." (Tr. 1029–1030)

We concur with the trial court's ruling that the telephone conversations were inadmissible as being self-serving and hearsay. We therefore find this proposition to be without merit.

In conclusion, we observe that the evidence amply supports the verdict of the jury. The record is free of any error which would justify modification or reversal notwithstanding the verdict of death, and for those reasons, the judgment and sentence appealed from is affirmed. The day originally set for the execution of the defendant Abelardo Llamas Garcia having passed, it is ordered, adjudged and decreed by this Court that the judgment and sentence of the District Court of Tulsa County, Oklahoma, Case Number CRF–69–2110, be carried out by the electrocution of Abelardo Llamas Garcia by the Warden of the Oklahoma State Penitentiary at McAlester, Oklahoma, on the 28th day of August 1972.

BAILEY, Special Judge (specially concurring).

The Constitution of this State and the Constitution of the United States, both assure that one charged with crime, is entitled to a fair trial. He is not guaranteed a perfect trial, a trial free from all imperfections. Our system of criminal justice is not so precise or exact as will permit every trial to be tried without error at all. In fact it might be said with great accuracy that no trial is perfectly tried.

To insure a defendant something more than a fair trial would place an intolerable burden on those officials charged with enforcement of our laws, and would effectively frustrate any law enforcement. Without enforcement of our laws the law of the jungle would prevail and sheer anarchy would be the unbearable result. Therefore in an organized society the most protection that we can accord our citizens is to guarantee a fair trial by an impartial jury.

Abelardo Llamas Garcia had a fair trial in this case. Those errors urged by defendant for reversal have been carefully examined and it is my opinion that his constitutional rights were protected and error of such a grievous consequence as to require a reversal did not occur. It is apparent that the trial court zealously sought to assure that the defendant received as fair a trial as the facts and circumstances would permit. The evidence of the defendant's guilt is clear and convincing and finding no reversible error, I respectfully concur with the opinion expressed herein.

BRETT, Judge (specially concurring).

I would modify this sentence to life imprisonment, because of the admitted error concerning the cross-examination of Roy M. Sullivan, Jr. In my opinion, the rule contained in Blanck v. State, supra, is not sufficient to support the conclusion that the error is "harmless" or "cured," when the death penalty is assessed. The defendant in Blanck v. State, supra, was convicted for acting under false pretenses in an Indian land transaction, and was sentenced to serve two years in the state penitentiary. The difference between the sentences in Blanck v. State, supra, and the instant case, is too vast for comparison and to serve the purpose herein intended. While the purpose of cross-examination may seem to have been fulfilled, I believe any doubt, as to whether or not it was, should be resolved in defendant's favor. Therefore, I would modify this sentence to life imprisonment. Otherwise, I agree the defendant received a fair trial.

ORDER ON REHEARING

In the light of Furman v. Georgia, Jackson v. Georgia, and Branch v. Texas, 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346, the judgment and sentence of death by electrocution is modified to a term of life imprisonment, and as so Modified, the judgment and sentence is Affirmed. It is so ordered.