STATE OF NORTH CAROLINA v. JAMES HOWARD WADDELL

No. 5

(Filed 18 January 1973)

1. **Constitutional Law § 36; Criminal Law § 135— death penalty — discretion of jury — unconstitutionality**

    Under the decision of *Furman v. Georgia*, 408 U.S. 238, the death sentence may not be inflicted if either judge or jury is permitted to impose that sentence as a matter of discretion.

2. **Constitutional Law § 36; Criminal Law §§ 120, 135; Rape § 7— rape— jury discretion to recommend life imprisonment — unconstitutionality — mandatory death sentence**

    The decision of *Furman v. Georgia*, 408 U.S. 238, invalidated the proviso of G.S. 14-21 giving the jury the discretion to recommend and thus fix the punishment for rape at life imprisonment; however, the invalid proviso is severable from the remainder of the statute, leaving death as the mandatory punishment for rape in North Carolina.

3. **Criminal Law §§ 120, 135— capital case — instructions to jury — mandatory death sentence**

    Upon the trial of any defendant charged with rape, murder in the first degree, arson or burglary in the first degree, the trial court may not instruct the jury that it may in its discretion add to its verdict of guilty a recommendation that defendant be sentenced to life imprisonment, but the court should charge on the constituent elements of the offense set out in the bill of indictment and instruct the jury under what circumstances a verdict of guilty or not guilty should be returned; upon the return of a verdict of guilty of any such offense, the court must pronounce a sentence of death. G.S. 14-17; G.S. 14-21; G.S. 14-52; G.S. 14-58.

4. **Constitutional Law § 35— ex post facto clause — applicability to judiciary — increase in punishment**

    While the letter of the *ex post facto* clause is addressed to legislative action, the constitutional ban against the retroactive increase of punishment for crime applies as well against judicial action having the same effect.

5. **Constitutional Law § 35; Criminal Law § 135— mandatory death penalty — prospective effect of decision**

    Since a judicial decision in effect changing the penalty for rape or other capital crimes from death or life imprisonment in the discretion of the jury to mandatory death would be *ex post facto* as to such offenses committed prior to the change, North Carolina's mandatory death penalty for rape, murder in the first degree, burglary in the first degree and arson may not be constitutionally applied to any offense committed prior to 18 January 1973, the date of this decision. Art. I, § 16, N. C. Constitution; Art. I, § 10, U. S. Constitution.

State v. Waddell

Justice LAKE concurring.

Chief Justice BOBBITT concurring in part and dissenting in part.

Justice HIGGINS concurring in result.

Justice SHARP concurring in the opinion of Chief Justice BOBBITT.

DEFENDANT appeals from judgment of *Blount, J.,* December 1971 Session, SAMPSON Superior Court.

Defendant was tried on a bill of indictment, proper in form, charging him with the rape of Mrs. Thelma Jackson on the 8th day of June 1971.

The State's evidence tends to show that when Mrs. Thelma Jackson returned from work about 6 p.m. on 8 June 1971 she unlocked the back door and entered her home. She found a black man standing behind a chair in her living room. He had a stocking over his face and a butcher knife in his pocket. He placed Mrs. Jackson in a chair, tied her hands together with a small cord, and told her he would kill her if she made a noise. Then, using the same cord, he tied her ankles together. She screamed when a neighbor passed on a tractor, and he placed the knife to her neck and threatened to cut her throat.

The intruder then placed Mrs. Jackson on the couch, sat beside her, and said: "I know all about you. I know your husband has been dead about four and a half or five years and you never had any children and you live alone and I know about you." After several minutes of conversation with Mrs. Jackson, he pulled her up from the couch and walked her to the bedroom. This operation took about ten minutes since her feet were still tied. He sat her down in a reclining chair in the bedroom, unzipped her dress in the back, untied her hands, and stripped all her clothing down to the waist. He then tied her hands again, untied her feet and completely undressed her. He then stuffed a large roll of cotton in her mouth but removed it when it appeared she was unable to breathe. He ripped a pillowcase into strips, tying one strip over her mouth and blindfolding her with another. He then placed her on the bed and raped her.

While Mrs. Jackson was still blindfolded, her assailant removed her from the bed, put her clothing back on her, bound her legs together again, and sat her in a chair. He then moved about the house, apparently gathering foodstuffs and other items. In response to Mrs. Jackson's inquiry after he had made several trips to the kitchen, he stated he was doing "what I

State v. Waddell

have to do." He finally left about 7:30 p.m., having been in Mrs. Jackson's presence about an hour and a half, the last thirty minutes of which she was blindfolded. She had observed and talked with him for one hour while he was in her home.

Mrs. Jackson was bleeding badly from her privates and needed medical attention. She eventually worked her hands free, removed her blindfold, untied her feet, and sought help at the home of a black family who lived across the road. Deputy Sheriff Chase arrived within ten minutes after being called.

Items missing from Mrs. Jackson's home included an old pair of Knapp shoes belonging to her deceased husband (S-3), a small teaspoon (S-10), and a roll of adhesive tape. When apprehended, defendant was wearing the shoes and had the spoon and a roll of Johnson & Johnson Adhesive Tape in a little leather case. At the preliminary hearing and in court at the trial, Mrs. Jackson stated that she recognized defendant by his build, "his looks and all of it," and said she would recognize his voice if she ever heard it again. She positively identified defendant as the man who raped her.

After interviewing Mrs. Jackson the night of the rape, officers began an investigation of the crime scene, checking for fingerprints and footprints. Fingerprints were lifted from the windowsill where defendant had entered the house, from the front of the medicine cabinet mirror in the kitchen of the Jackson residence, from the first drawer of the chest of drawers in Mrs. Jackson's bedroom where defendant had obtained the pillowcases he ripped up, from inside the medicine cabinet door, and from a kitchen cabinet. All these fingerprints were later compared by an expert with ink impressions of defendant's fingerprints and in the opinion of the expert were identical.

A set of footprints led from Mrs. Jackson's home to a point in the woods at the base of a pine tree about one hundred fifty yards away where the officers found a pile of articles, including a lady's stocking, a piece of cord, an empty pear can, a pair of brown gloves, a pair of lady's panties and two pieces of a torn pillowcase. Many of these items were identified as having come from Mrs. Jackson's home.

While officers were searching for Mrs. Jackson's assailant, Bruce Jackson, a former highway patrolman, saw defendant in the woods eight to ten miles from Mrs. Jackson's home. Although many officers were in the area searching, Bruce Jackson was

alone at the time. He spoke to defendant who said his name was Jackson; that he worked for the Town of Dunn and "they had sent him down there to help capture that man that had messed that white woman about." When asked for some identification, defendant grabbed Bruce Jackson's shotgun and the two men tussled over it for ten or fifteen minutes. Defendant kept repeating, "I am the one that you are looking [for] but you ain't going to tell anybody because I am going to kill you right here and now." During the tussle Mr. Jackson succeeded in firing the shotgun and thus attracted the attention of other officers in the woods. They converged on the scene and took defendant into custody.

Defendant offered no evidence. At the close of the State's evidence his motion for judgment of nonsuit was denied. The jury returned a verdict of guilty of rape as charged in the bill of indictment. Defendant's motion to set the verdict aside was denied and defendant was sentenced to death. He appealed to the Supreme Court assigning as error the denial of his motions and further contending that the death penalty constitutes cruel and unusual punishment in violation of the Eighth and Fourteenth Amendments to the Constitution of the United States.

*David J. Turlington, Jr., Attorney for defendant appellant.*

*Robert Morgan, Attorney General, and Jean A. Benoy, Deputy Attorney General, for the State of North Carolina.*

HUSKINS, Justice.

We overrule defendant's assignments of error based on denial of his motions for nonsuit and to set aside the verdict. The evidence is overwhelmingly sufficient to carry the case to the jury and to support the verdict. Likewise, defendant's third assignment addressed to the charge has no merit and cannot be sustained. The court's charge on circumstantial evidence is free from prejudicial error. We therefore put aside these assignments without discussion and go directly to the constitutional question raised by defendant and argued in the briefs.

Defendant contends that the imposition and carrying out of the death penalty was held in *Furman v. Georgia,* 408 U.S. 238, 33 L.Ed. 2d 346, 92 S.Ct 2726 (1972), to constitute cruel and unusual punishment in violation of the Eighth and Fourteenth Amendments. The State, on the other hand, disputes

defendant's interpretation of the holding in *Furman* and argues that the death sentence was lawfully and constitutionally imposed in this case and should be carried out. These antagonistic positions require an analysis of the *Furman* decision.

*Furman v. Georgia* was consolidated with *Jackson v. Georgia* and *Branch v. Texas* for decision. Each defendant was black. Furman killed a Georgia householder while seeking to enter the home at night. Jackson entered a Georgia home after the husband left for work, held scissors against the neck of the wife and raped her. Branch entered the Texas home of a 65-year-old widow, a white woman, while she slept and raped her, holding his arm against her throat. Furman was convicted of murder, Jackson and Branch of rape, and each was sentenced to death after a trial by jury which, under applicable Georgia and Texas statutes, had discretionary authority to determine whether to impose the death penalty. On certiorari, the United States Supreme Court reversed the judgment in each case insofar as it left undisturbed the death sentence imposed, and the cases were remanded for further proceedings. In an opinion expressing the views of five members of the Court, it was held that the imposition and carrying out of the death sentence in the three cases before the Court constituted cruel and unusual punishment in violation of the Eighth and Fourteenth Amendments. Four members of the Court dissented, voting to sustain the constitutionality of the statutes under which defendants were tried and sentence of death imposed.

Prior to the decision in *Furman v. Georgia, supra,* the United States Supreme Court implicitly approved or, albeit in dictum, expressly upheld the constitutionality of capital punishment in many cases, including *Wilkerson v. Utah,* 99 U.S. 130, 25 L.Ed. 345 (1879) ; *In re Kemmler,* 136 U.S. 436, 34 L.Ed. 519, 10 S.Ct. 930 (1890) ; *Weems v. United States,* 217 U.S. 349, 54 L.Ed. 793, 30 S.Ct. 544 (1910) ; *Louisiana ex rel. Francis v. Resweber,* 329 U.S. 459, 91 L.Ed. 422, 67 S.Ct. 374 (1947) ; *Trop v. Dulles,* 356 U.S. 86, 2 L.Ed. 2d 630, 78 S.Ct. 590 (1958) ; *Witherspoon v. Illinois,* 391 U.S. 510, 20 L.Ed. 2d 776, 88 S.Ct. 1770 (1968) ; *McGautha v. California,* 402 U.S. 183, 28 L.Ed. 2d 711, 91 S.Ct. 1454 (1971). Thus, since the ratification of the Eighth Amendment one hundred eighty-one years ago, no decision of the United States Supreme Court prior to *Furman* casts the slightest doubt on the constitutionality of capital punishment. Therefore, since the decision in *Furman* is not grounded on prior decisions of the Court, the scope of

that holding must be gleaned from the separate opinions of the Justices themselves.

The nine opinions focus upon the Eighth Amendment which provides: "Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted." The proscription of cruel and unusual punishments is applicable to the States through the Due Process Clause of the Fourteenth Amendment. *Powell v. Texas,* 392 U.S. 514, 20 L.Ed. 2d 1254, 88 S.Ct. 2145 (1968); *Robinson v. California,* 370 U.S. 660, 8 L.Ed. 2d 758, 82 S.Ct. 1417 (1962).

We note at the outset that only two members of the Court, Mr. Justice Brennan and Mr. Justice Marshall, concluded that capital punishment for all crimes under all circumstances is prohibited by the Eighth Amendment. Mr. Justice Brennan summarized his views in these words:

"At bottom, then, the Cruel and Unusual Punishments Clause prohibits the infliction of uncivilized and inhuman punishment. . . . The test, then, will ordinarily be a cumulative one: If a punishment is unusually severe, if there is a strong probability that it is inflicted arbitrarily, if it is substantially rejected by contemporary society, and if there is no reason to believe that it serves any penal purpose more effectively than some less severe punishment, then the continued infliction of that punishment violates the command of the Clause that the State may not inflict inhuman and uncivilized punishments upon those convicted of crimes. . . . Under these principles and this test, death is today a 'cruel and unusual' punishment."

Mr. Justice Marshall reached a like conclusion when he wrote:

"There is but one conclusion that can be drawn from all of this—*i.e.,* the death penalty is an excessive and unnecessary punishment which violates the Eighth Amendment. . . . In addition, even if capital punishment is not excessive, it nonetheless violates the Eighth Amendment because it is morally unacceptable to the people of the United States at this time in their history."

Thus, it may be seen that these two Justices joined in the *Furman* decision on the basis that capital punishment is *per se* unconstitutional.

Mr. Justice Douglas rested his concurrence on a different basis. He wrote:

"In these three cases the death penalty was imposed, one of them for murder, and two for rape. In each *the determination of whether the penalty should be death or a lighter punishment was left by the State to the discretion of the judge or of the jury.* In each of the three cases the trial was to a jury. [Emphasis added] . . . In a nation committed to Equal Protection of the laws there is no permissible 'caste' aspect of law enforcement. Yet we know that the discretion of judges and juries in imposing the death penalty enables the penalty to be selectively applied, feeding prejudices against the accused if he is poor and despised, poor and lacking political clout, or if he is a member of a suspect or unpopular minority, and saving those who by social position may be in a more protected position. . . . Thus, these discretionary statutes are unconstitutional in their operation. They are pregnant with discrimination. . . . Any law which is nondiscriminatory on its face may be applied in such a way as to violate the Equal Protection Clause of the Fourteenth Amendment. *Yick Wo v. Hopkins,* 118 U.S. 356. Such conceivably might be the fate of a mandatory death penalty, where equal or lesser sentences were imposed on the elite, a harsher one on the minorities or members of the lower castes. *Whether a mandatory death penalty would otherwise be constitutional is a question I do not reach.*" (Emphasis added.)

It seems clear that Mr. Justice Douglas left open the question of the constitutionality of a mandatory death penalty and voted to invalidate the death sentence in *Furman* and companion cases on the ground that the trial jury was given statutory discretion as to whether a defendant convicted of rape or murder should be sentenced to death or to life imprisonment.

Mr. Justice Stewart joined the majority opinion on similar grounds: That under the Georgia and Texas statutes, the death penalty was not mandatory for murder and rape but could be imposed in the unfettered discretion of trial juries, and that the exercise of this discretion resulted in "freakish" selection of those who should be executed for their crimes. He expressed his views as follows:

"[A]t least two of my Brothers have concluded that the infliction of the death penalty is constitutionally im-

permissible in all circumstances under the Eighth and Fourteenth Amendments. Their case is a strong one. *But I find it unnecessary to reach the ultimate question they would decide.* [Emphasis added] . . . The constitutionality of capital punishment in the abstract is not, however, before us in these cases. For the Georgia and Texas Legislatures have not provided that the death penalty shall be imposed upon all those who are found guilty of forcible rape. And the Georgia Legislature has not ordained that death shall be the automatic punishment for murder. . . . These death sentences are cruel and unusual in the same way that being struck by lightning is cruel and unusual. For, of all the people convicted of rapes and murders in 1967 and 1968, many just as reprehensible as these, the petitioners are among a capriciously selected random handful upon whom the sentence of death has in fact been imposed. . . . I simply conclude that the Eighth and Fourteenth Amendments cannot tolerate the infliction of a sentence of death under legal systems that permit this unique penalty to be so wantonly and so freakishly imposed."

Mr. Justice White concurred in the majority opinion for reasons substantially similar to those of Justice Stewart. The following language from his concurring opinion depicts his views:

"In joining the Court's judgments, therefore, I do not at all intimate that the death penalty is unconstitutional *per se* or that there is no system of capital punishment that would comport with the Eighth Amendment. . . . I cannot avoid the conclusion that as the statutes before us are now administered, the penalty is so infrequently imposed that the threat of execution is too attenuated to be of substantial service to criminal justice. . . . That conclusion, as I have said, is that the death penalty is exacted with great infrequency even for the most atrocious crimes and that there is no meaningful basis for distinguishing the few cases in which it is imposed from the many cases in which it is not. The short of it is that the policy of vesting sentencing authority primarily in juries . . . has so effectively achieved its aims that capital punishment within the confines of the statutes now before us has for all practical purposes run its course."

Four members of the Court dissented and voted to uphold the constitutionality of the Georgia and Texas statutes under which Furman, Jackson and Branch were tried and sentenced to death. The position of the four dissenters is best summed up by Chief Justice Burger as follows:

> "There are no obvious indications that capital punishment offends the conscience of society to such a degree that our traditional deference to the legislative judgment must be abandoned. . . . Capital punishment is authorized by statute in 40 States, the District of Columbia and in the federal courts for the commission of certain crimes. On four occasions in the last eleven years Congress has added to the list of federal crimes punishable by death. In looking for reliable indicia of contemporary attitude, none more trustworthy has been advanced. . . . Today the Court has not ruled that capital punishment is *per se* violative of the Eighth Amendment; nor has it ruled that the punishment is barred for any particular class or classes of crimes. The substantially similar concurring opinions of Mr. Justice Stewart and Mr. Justice White, which are necessary to support the judgment setting aside petitioners' sentences, stop short of reaching the ultimate question. . . . The critical factor in the concurring opinions of both Mr. Justice Stewart and Mr. Justice White is the infrequency with which the penalty is imposed. This factor is taken not as evidence of society's abhorrence of capital punishment . . . but as the earmark of a deteriorated system of sentencing. It is concluded that petitioners' sentences must be set aside, not because the punishment is impermissibly cruel, but because juries and judges have failed to exercise their sentencing discretion in acceptable fashion."

[1] The foregoing quotations from the various separate opinions in *Furman* compel the conclusion that capital punishment has not been declared unconstitutional *per se*. Rather, the *Furman* decision holds that the Eighth and Fourteenth Amendments will no longer tolerate the infliction of the death sentence if either judge or jury is permitted to impose that sentence as a matter of discretion.

[2] We now consider the effect of the *Furman* decision on G.S. 14-21 which reads as follows:

> "Every person who is convicted of ravishing and carnally knowing any female of the age of twelve years or

more by force and against her will, or who is convicted of unlawfully and carnally knowing and abusing any female child under the age of twelve years, shall suffer death: *Provided, if the jury shall so recommend at the time of rendering its verdict in open court, the punishment shall be imprisonment for life in the State's prison, and the court shall so instruct the jury.*" (Emphasis added)

Does *Furman* invalidate G.S. 14-21 in its entirety or invalidate only the discretionary proviso, leaving death as the mandatory punishment for rape in North Carolina? A look at history is necessary to put the question in proper perspective.

Blackstone's Commentaries tell us:

"Rape was punished by the Saxon laws . . . with death . . . . But this was afterwards thought too hard: and in its stead another severe, but not capital, punishment was inflicted by William the conqueror; *viz,* castration and loss of eyes; which continued till after Bracton wrote, in the reign of Henry the third. * * *

"In the 3 Edw. I. [1275] by the statute Westm. 1. c. 13. the punishment of rape was much mitigated: the offence itself being reduced to a trespass, if not prosecuted by the woman within forty days, and subjecting the offender only to two years imprisonment, and a fine at the king's will. But, this lenity being productive of the most terrible consequences, it was in ten years afterwards, 13 Edw. I. found necessary to make the offence of rape felony, by statute Westm. 2. c. 34. And by statute 18 Eliz. c. 7. it is made felony without benefit of clergy . . . . " 4 W. Blackstone, Commentaries, 211-2 (1st ed. 1769).

In 1778, the State of North Carolina enacted what is now G.S. 4-1 which states:

"All such parts of the common law as were heretofore in force and use within this State, or so much of the common law as is not destructive of, or repugnant to, or inconsistent with, the freedom and independence of this State and the form of government therein established, and which has not been otherwise provided for in whole or in part, not abrogated, repealed, or become obsolete, are hereby declared to be in full force within this State."

State v. Waddell

By this statute the common law death penalty for rape was adopted in North Carolina. This punishment was codified in Vol. 1, c. 34, § 5 of the 1837 Revised Statutes of North Carolina.

In 1869, the General Assembly of North Carolina reenacted the punishment for rape in the following language:

"Every person who is convicted, in due course of law, of ravishing and carnally knowing any female of the age of ten years or more by force and against her will; or who is convicted, in like manner, of unlawfully and carnally knowing and abusing any female child under the age of ten years, shall suffer death." Public Laws of 1868-69, c. 167, § 2.

An amendment in 1917 raised the age of consent from ten to twelve years. See Public Laws 1917, c. 29.

Thus, death has been the punishment for rape in North Carolina for almost two hundred years. Our present statute on the subject, G.S. 14-21, was amended in 1949 by adding the proviso which (1) empowers the jury in its discretion to recommend and thus to fix the punishment at life imprisonment, and (2) requires the trial judge to so instruct the jury. Session Laws of 1949, c. 299, § 4.

Since the 1949 amendment adding the proviso, seventeen bills or resolutions have been introduced in the General Assembly of North Carolina designed to abolish or limit the imposition of the death penalty for rape or other capital offenses. See House Bills 924, 925, 927 and 928 in the 1955 Session; House Bill 113 in the 1961 Session; House Bill 35, Senate Bill 27 and Senate Resolution 173 in the 1963 Session; House Bills 103 and 351 in the 1965 Session; House Bills 68, 71, 138 and 314 in the 1967 Session; House Bill 160 in the 1969 Session; and House Bill 397 and Senate Bill 251 in the 1971 Session. All of these bills and resolutions failed to receive a favorable report from the committee to which referred, or were tabled or defeated on the floor of the House in which introduced.

The new State Constitution, which was ratified by the people in the general election of 1970, retained the provision contained in the former Constitution of North Carolina authorizing the General Assembly to provide by statute for the imposition of the death penalty for murder, arson, burglary and rape. See Constitution of North Carolina, Article XI, Sec-

tion 2. Thus, there is nothing in the legislative or constitutional history of this State to indicate an intent by the Legislature, or by the people, to reduce the punishment for rape from death to life imprisonment, or to indicate that the 1949 proviso was enacted for that purpose except upon the discretionary recommendation of the jury, or to indicate that such proviso would have been enacted at all had its unconstitutionality been foreseen by the 1949 General Assembly. Rather, such history demonstrates a constant intent by the people and their representatives to retain the death penalty for murder, arson, burglary and rape notwithstanding the proviso added in 1949.

It is the proviso, and the proviso alone, which creates the discretionary difficulty condemned by the *Furman* decision; and it is quite clear that *Furman* strikes down the proviso as violative of the Eighth and Fourteenth Amendments.

The question then arises: Does the remainder of G.S. 14-21 stand alone with death as the mandatory punishment for rape? Or, is the proviso such a constituent and inherent part of a single statutory scheme of punishment that it is inseverable and the entire statute must fall?

In 16 Am. Jur. 2d, Constitutional Law, § 186, the rule of severability is thus stated:

"If the objectionable parts of a statute are severable from the rest in such a way that the legislature would be presumed to have enacted the valid portion without the invalid, the failure of the latter will not necessarily render the entire statute invalid, but the statute may be enforced as to those portions of it which are constitutional. If, however, the constitutional and the unconstitutional portions are so dependent on each other as to warrant the belief that the legislature intended them to take effect in their entirety, it follows that if the whole cannot be carried into effect, it will be presumed that the legislature would not have passed the residue independently, and accordingly, the entire statute is invalid."

The original portion of G.S. 14-21 with its mandatory death penalty for rape stood alone and was given full effect by the courts of this State for a century prior to the enactment of the 1949 proviso. Grammatically, as well as historically, the two portions of the statute are distinct and separate and the con-

State v. Waddell

stitutional invalidity of the added portion will not destroy the part which was in existence prior to the enactment of the unconstitutional portion.

"Usually, when an amendatory exception to a statute proves unconstitutional, the original statute stands wholly unaffected by it." 16 Am. Jur. 2d, Constitutional Law, § 184. "When exceptions, exemptions, or provisos in a statute are found to be invalid, the entire act may be void on the theory that by striking out the invalid exception the act has been widened in its scope and therefore cannot properly represent the legislative intent. *This result is not reached, however, when the repugnant exception was added by way of amendment,* as it may be said that the Legislature did intend, at least originally, to pass the act without offering the exception." (Emphasis added) Sutherland, Statutes and Statutory Construction, § 2412 (3d ed. 1943).

In *Frost v. Corporation Commission,* 278 U.S. 515, 73 L.Ed. 483, 49 S.Ct. 235 (1929), the United States Supreme Court dealt with an Oklahoma statute which, as originally enacted, required a certificate of public convenience and necessity in order to engage in the business of operating a cotton gin. The statute was thereafter amended to insert a proviso exempting gins operated by cooperatives. The Court held the proviso violated the Equal Protection Clause of the Fourteenth Amendment but upheld the statute as initially written, saying:

"Here it is conceded that the statute, before the amendment, was entirely valid. When passed, it expressed the will of the legislature which enacted it. Without an express repeal, a different legislature undertook to create an exception, but, since that body sought to express its will by an amendment which, being unconstitutional, is a nullity and, therefore, powerless to work any change in the existing statute, *that statute must stand as the only valid expression of the legislative intent."* (Emphasis added)

In *United States v. Jackson,* 390 U.S. 570, 20 L.Ed. 2d 138, 88 S.Ct. 1209 (1968), the Supreme Court of the United States held invalid a proviso in the Federal Kidnapping Act (18 U.S.C. § 1201(a)) providing for the death sentence upon conviction of kidnapping under certain circumstances if the jury so recommended in its verdict. Originally, the statute made the crime punishable by imprisonment only. The Court held that

the remainder of the statute was valid since the unconstitutional proviso was severable from it, saying:

> "As we said in *Champlin Rfg. Co. v. Commission,* 286 U.S. 210, 234: 'The unconstitutionality of a part of an Act does not necessarily defeat . . . the validity of its remaining provisions. Unless it is evident that the legislature would not have enacted those provisions which are within its power, independently of that which is not, the invalid part may be dropped if what is left is fully operative as a law.'

> "Under this test, it is clear that the clause authorizing capital punishment is severable from the remainder of the kidnapping statute and that the unconstitutionality of that clause does not require the defeat of the law as a whole."

The fact that the proviso in G.S. 14-21 gives the jury the discretion to recommend life imprisonment rather than death does not distinguish the case before us from *United States v. Jackson, supra.*

In *Bank v. Lacy,* 188 N.C. 25, 123 S.E. 475 (1924), this Court said: "The invalidity of one part of a statute does not nullify the remainder when the parts are separable and the invalid part was not the consideration or inducement for the Legislature to enact the part that is valid." To like effect: *Jackson v. Board of Adjustment,* 275 N.C. 155, 166 S.E. 2d 78 (1969); *Clark v. Meyland,* 261 N.C. 140, 134 S.E. 2d 168 (1964); *Fox v. Commissioners of Durham,* 244 N.C. 497, 94 S.E. 2d 482 (1956); *Power Co. v. Clay County,* 213 N.C. 698, 197 S.E. 603 (1938); *Connolly v. Union Sewer Pipe Co.,* 184 U.S. 540, 46 L.Ed. 679, 22 S.Ct. 431 (1902).

It is the proviso which confers upon juries the discretion to send one defendant to death and another to prison for life for the same crime committed under substantially similar circumstances. This, and only this, is what *Furman* condemns as violative of the Eighth and Fourteenth Amendments. The proviso, then, can no longer be given effect as part of the law of North Carolina. This leaves in effect the original statute making the death sentence mandatory upon a conviction of rape, and forbids an instruction to the jury that it may, in its discretion, fix a different punishment.

In light of the authorities cited, we hold that the unconstitutional proviso in G.S. 14-21 is severable and the remainder

of the statute with death as the mandatory punishment for rape remains in full force and effect. A similar conclusion was reached by the Supreme Court of Delaware in *State v. Dickerson,* _____ Del. _____, _____ A. 2d _____, 12 Cr. L. 2145 (decided 1 November 1972).

[3] We recognize that the Legislature, not the courts, decides public policy, responds to public opinion and, by legislative enactment, reflects society's standards. The matter of retention, modification or abolition of the death penalty is a question for the law-making authorities rather than the courts. In view of the decision in *Furman,* the Legislature may wish to delete the unconstitutional proviso from G.S. 14-21 (rape), G.S. 14-17 (murder), G.S. 14-52 (burglary), and G.S. 14-58 (arson); or it may wish to rewrite these statutes altogether to give expression to what it conceives to be the public will. Meanwhile, we hold that the effect of the *Furman* decision upon the law of North Carolina concerning the punishment for rape, murder in the first degree, arson and burglary in the first degree is this: Upon the trial of any defendant so charged, the trial judge may not instruct the jury that it may in its discretion add to its verdict of guilty a recommendation that defendant be sentenced to life imprisonment. The trial judge should charge on the constituent elements of the offense set out in the bill of indictment and instruct the jury under what circumstances a verdict of guilty or not guilty should be returned. Upon the return of a verdict of guilty of any such offense, the court must pronounce a sentence of death. The punishment to be imposed for these capital felonies is no longer a discretionary question for the jury and therefore no longer a proper subject for an instruction by the judge.

Since the invalid proviso in G.S. 14-21 was given effect from the time it was enacted in 1949 to the date of the *Furman* decision in all cases wherein the defendant was convicted of rape or other capital crimes under the statutes applicable thereto, the practical effect of a judicial determination that the proviso is severable and therefore eliminated from the statute is to change the penalty for rape (or other capital crimes) from *death or life imprisonment in the discretion of the jury* to *mandatory death.* An upward change of penalty by legislative action cannot constitutionally be applied retroactively. Article I, section 16 of the Constitution of North Carolina forbids the enactment of any *ex post facto* law. The Federal Constitution contains a like prohibition against *ex post facto* enactments

by a state. See Constitution of the United States, Art. I, sec. 10. It has been held that this section of the Constitution "forbids the application of any new punitive measure to a crime already consummated, to the detriment or material disadvantage of the wrongdoer. * * * It hardly could be thought that, if a punishment for murder of life imprisonment or death were changed to death alone, the latter penalty could be applied to homicide committed before the change." *Lindsey v. Washington,* 301 U.S. 397, 81 L.Ed. 1182, 57 S.Ct. 797 (1937). It thus appears that where the punishment at the time of the offense was death or life imprisonment in the discretion of the jury, as in the case before us, a change by the Legislature to death alone would be *ex post facto* as to such offenses committed prior to the change. *State v. Broadway,* 157 N.C. 598, 72 S.E. 987 (1911).

[4] While we recognize that the letter of the *ex post facto* clause is addressed to legislative action, the constitutional ban against the retroactive increase of punishment for a crime applies as well against judicial action having the same effect. "[A]n unforeseeable judicial enlargement of a criminal statute, applied retroactively, operates precisely like an *ex post facto* law, such as Art. I, § 10, of the Constitution forbids. An *ex post facto* law has been defined by this Court as one 'that makes an action done before the passing of the law, and which was *innocent* when done, criminal; and punishes such action' or 'that aggravates *a crime,* or makes it *greater* than it was, when committed.' [Citation omitted] If a state legislature is barred by the *Ex Post Facto* Clause from passing such a law, it must follow that a State Supreme Court is barred by the Due Process Clause from achieving precisely the same result by judicial construction." *Bouie v. Columbia,* 378 U.S. 347, 12 L.Ed. 2d 894, 84 S.Ct. 1697 (1964).

[5] For the reasons stated, we hold that North Carolina's mandatory death penalty for rape, murder in the first degree, burglary in the first degree and arson may not be constitutionally applied to any offense committed prior to the date of this decision but shall be applied to any offense committed after such date. *Compare, Johnson v. New Jersey,* 384 U.S. 719, 16 L.Ed. 2d 882, 86 S.Ct. 1772 (1966).

We now turn to the task of applying the *Furman* decision, and the holding here, to the death sentence imposed upon defendant in this case.

Defendant was tried, convicted and sentenced under G.S. 14-21, and the trial judge instructed the jury, *inter alia*, as follows: "If you return a verdict of guilty of rape, you may accompany your verdict with a recommendation of life imprisonment. If you make no such recommendation, the law provides that the defendant will be put to death in the gas chamber. If you do so recommend, the punishment will be imprisonment for life. You are completely free to accompany a verdict of guilty with a recommendation of life imprisonment or not, as the law leaves that to your complete and unbridled discretion. Thus members of the jury, depending on how you find the facts, there are three possible verdicts which you may return, you may find the defendant guilty of rape with no recommendation; guilty of rape with a recommendation of life imprisonment or not guilty." Thus, the jury was permitted to exercise its discretion and choose between death and life imprisonment. The proviso in G.S. 14-21 requiring the judge to so charge and permitting the jury in its discretion to so choose is not materially different from the discretion vested in the jury by the Georgia and Texas statutes condemned by *Furman*. It is apparent, therefore, that *Furman* forbids the imposition of the death penalty in this case. This conclusion is buttressed by the fact that, following the decision in *Furman*, five cases in which we had affirmed the imposition of the death sentence were remanded to this Court by the Supreme Court of the United States "for further proceedings," the judgment of this Court having been vacated "insofar as it leaves undisturbed the death penalty imposed." We remanded those cases to the respective superior courts for imposition of sentences of life imprisonment. *State v. Miller*, 281 N.C. 740, 190 S.E. 2d 841 (1972); *State v. Hamby and Chandler*, 281 N.C. 743, 191 S.E. 2d 66 (1972); *State v. Chance*, 281 N.C. 746, 191 S.E. 2d 65 (1972); *State v. Westbrook*, 281 N.C. 748, 191 S.E. 2d 68 (1972); *State v. Doss*, 281 N.C. 751, 191 S.E. 2d 70 (1972).

Accordingly, the judgment of the Superior Court of Sampson County insofar as it imposed the death penalty upon this defendant is reversed. The case is remanded to the Superior Court of Sampson County with directions to proceed as follows:

1. The presiding judge of the Superior Court of Sampson County will cause to be served on the defendant, James Howard Waddell, and on his counsel of record, notice to appear during a session of said Superior Court at a designated time, not less

than ten days from the date of the notice, at which time, in open court, the defendant, James Howard Waddell, being present in person and being represented by his counsel, the presiding judge, based on the verdict of guilty of rape returned by the jury at the trial of this case at the December 1971 Session, will pronounce judgment that the defendant, James Howard Waddell, be imprisoned for life in the State's prison.

2. The presiding judge of the Superior Court of Sampson County will issue a writ of habeas corpus to the official having custody of the defendant, James Howard Waddell, to produce him in open court at the time and for the purpose of being present when the judgment imposing life imprisonment is pronounced.

REMANDED FOR JUDGMENT.

Justice LAKE concurring.

I concur in all parts of the opinion of Justice Huskins. In view of the length of the dissenting portion of the opinion of the Chief Justice and of the number of authorities cited therein, and because of the importance of the issue, I deem it advisable to state, as briefly as possible, why I do not find its argument persuasive or the citations convincing upon the question with which the opinion of Justice Huskins deals.

The jury having returned a verdict of guilty of rape without making a recommendation that the defendant's punishment be life imprisonment, a sentence to death was imposed by the trial court pursuant to G.S. 14-21. It is, therefore, our duty to determine the effect now to be given that statute by the courts of North Carolina. We may not properly bypass that task, nor escape our responsibility for it by labeling the question one of policy for determination by the Legislature.

The Supreme Court of the United States being the higher authority on the validity of judgments under the Constitution of the United States, its mandates, issued in reliance upon *Furman v. Georgia,* 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed. 2d 346, vacating the death sentences previously affirmed by this Court in the five cases cited in the opinion of Justice Huskins, became the law of those five cases. Under the compulsion of those mandates, this Court remanded those cases to the respective superior courts for the imposition of sentences of life imprisonment.

State v. Waddell

The present case, on the contrary, is before us for the first time. In it we have no mandate from the Supreme Court of the United States vacating the death sentence imposed upon this defendant. In the absence thereof, it is our duty, not that of the Legislature, to determine just what the United States Supreme Court decided in *Furman v. Georgia, supra,* and to determine the present state of the law of North Carolina with reference to punishment for the crime of rape in the light of that decision.

Only this Court can determine whether any portion of G.S. 14-21 is the law of North Carolina today and, if so, which portion. The Legislature, now in session, cannot make that determination. The Legislature can determine what the law of this State ought to be and shall be in the future. That is policy making and that is the Legislature's prerogative and responsibility. It is for us, and for us alone, to determine what part of G.S. 14-21, if any, is the law of North Carolina today and determinative of the validity of the sentence from which this defendant appeals. That is not policy making but the interpretation of the statute—an exercise of the judicial function which we may not abdicate or assign to the Legislature. Constitution of North Carolina, Art. I, § 6; Art. IV, § 1.

It is quite clear, as the opinion of Justice Huskins plainly states, that it is for the Legislature, not for this Court, to determine the policy of this State as to what acts shall be deemed crimes and as to the punishment therefor; that is, to determine what punishment ought to be and shall be imposed for the offense of rape hereafter committed. Constitution of North Carolina, Art. I, § 6; Art. II, § 1; Art. XI, § 2. But the Legislature has spoken in G.S. 14-21 and, until it speaks again, it is the duty of this Court to determine what, if anything, remains of its pronouncement in G.S. 14-21 after the decision in *Furman v. Georgia, supra.* No officer or agency, save this Court, can make that determination.

The determination of that question as stated in the opinion of Justice Huskins is, in my view, unassailably correct. If the Legislature, now sitting, deems the result of our determination is unwise, as a matter of policy, it may, as to rapes hereafter committed, adopt and promulgate a different rule as to punishment. That is its responsibility, not ours.

State v. Waddell

The opinion of the Chief Justice states:

"If *Furman* had decided that the portion of G.S. 14-21 quoted above was separable and invalid and that death is now the sole and exclusive punishment for rape, such decision would apply to all rapes committed subsequent to 29 June 1972, the date *Furman* was decided. But this was not the decision in *Furman*."

Of course, it was not, for the simple reason, if for none other, that the Supreme Court of the United States does not have the authority to decide that question. Whether a statute is separable or inseparable is a question of statutory interpretation. It is well settled that the interpretation of a state statute is a question to be determined by the supreme court of the state. The Supreme Court of the United States has repeatedly accepted as binding upon it the interpretation placed upon state statutes by the highest courts of such states.

Thus, the Supreme Court of the United States has not said, and may not properly determine that G.S. 14-21 is or is not separable. What it has said in *Furman v. Georgia, supra,* is that the discretion which the proviso in G.S. 14-21 undertook to vest in North Carolina juries cannot be conferred upon them consistently with the Fourteenth Amendment. It having so held, it is now the prerogative and duty of this Court, and this Court alone, to determine whether the proviso is severable from the original statute unto which the proviso was attached by amendment in 1949. Thus, it is the date of the decision of that question by this Court—today—not the date of the decision in *Furman v. Georgia, supra,* which fixes the offenses of rape for which a death sentence may be imposed without running afoul of the Ex Post Facto principle.

The opinion of the Chief Justice further states:

"*Furman* simply held that *the death penalty provision* of G.S. 14-21 as now constituted was invalid and that, absent amendment, no death sentence can be constitutionally imposed and carried out."

I do not find the words, "absent amendment," in any of the nine opinions by the justices in *Furman v. Georgia, supra,* nor in the per curiam statement of the decision therein. *Furman v. Georgia, supra,* did not hold "the death penalty provision of

G.S. 14-21" invalid. It held, as the opinion of Justice Huskins states, that the death penalty cannot be imposed *at a time when juries or judges are given the discretion to impose the death penalty on one defendant and life imprisonment on another for the same offense*—quite a different thing.

I am unable to agree with the reasoning by which the Chief Justice reaches the conclusion that the defeat in 1971 of the legislative proposal to abolish the death penalty for rape and make life imprisonment the mandatory punishment therefor now compels us to hold that, since *Furman v. Georgia supra,* life imprisonment has become the mandatory punishment for the crime. Quite obviously, the 1971 Legislature preferred, as a matter of policy, to leave North Carolina juries in possession of the discretion which the 1949 amendment to G.S. 14-21 attempted to give them. It seems to me perfectly clear that the 1971 Legislature did not believe the then prophecy that the United States Supreme Court would decide as it did in *Furman v. Georgia, supra.* As the opinions of the four dissenting justices in *Furman v. Georgia, supra,* show, the earlier decisions of the Court afforded ample basis for such legislative disbelief. However, in any event, the Chief Justice's opinion, if adopted by this Court, would result in our declaring G.S. 14-21 now to mean precisely what the 1971 Legislature expressly refused to make it say. This we may not do. The Legislature of 1971 obviously wanted the whole of G.S. 14-21, including the proviso, which it believed constitutionally permissible, but this is far from showing it wanted the whole or nothing. It certainly fails to show that, if unable to have the whole, it wanted the part which it refused to adopt, standing alone, in preference to the part which it refused to repeal.

The array of decisions from other states, cited in the opinion of the Chief Justice, are simply in point on the question of the severability of G.S. 14-21. In the first place, substantially all of them, if not all, held only that the death penalty may not be imposed by a state in a case which arose and was adjudicated while the state undertook to give its juries the discretion which *Furman v. Georgia, supra,* held cannot be vested in juries. In so holding these decisions do not conflict with the opinion of Justice Huskins. In the second place, of all the cited decisions only those from Mississippi and Florida appear to contain any discussion of the question of the severability of the various state statutes involved and the Mississippi and Florida decisions

appear to rest on the acceptance by those courts of the view that their statutes were severable and the life sentence provisions therein were the parts which survived the decision in *Furman v. Georgia, supra.* In the third place, decisions from other states as to the severability of their statutes cannot help us materially in determining whether our own statute is severable, even if the wording of the statutes be identical, because the legislative history of the respective statutes may well be quite different. As the opinion of Justice Huskins demonstrates, the history of G.S. 14-21 leads to the conclusion that the proviso, added by the amendment of 1949, is severable from the remainder of the statute.

It is one thing to hold, as the Mississippi and Florida Courts appear to have done, that a statute like G.S. 14-21 is severable and the part which survives *Furman v. Georgia, supra,* is that providing for a life sentence. This would, as Justice Huskins has demonstrated, simply be a most strained and improbable view of the intent of the North Carolina Legislature in the light of its repeated refusals to abolish capital punishment. It is a far different thing to say, as the opinion of the Chief Justice suggests, that G.S. 14-21 is an inseparable whole.

If this view suggested in the opinion of the Chief Justice were correct, it would necessarily follow that the imposition of a sentence to imprisonment for life would be unlawful. It is well settled, as shown by the authorities cited by Justice Huskins, that if the provisions of a statute are, indeed, so interrelated that they are an inseparable whole, the statute cannot be partly unconstitutional and partly constitutional. Quite obviously, the effect of *Furman v. Georgia, supra,* is that G.S. 14-21 is not, in its entirety, constitutional. If it be inseparable, then the entire statute would fall under the impact of *Furman v. Georgia, supra,* and G.S. 14-21 would authorize no sentence whatever. In that event, rape being a felony at common law and no specific punishment being provided by a valid statute, G.S. 14-2 would apply and the maximum sentence for rape would be imprisonment for ten years plus a fine.

Of course, the real thrust of the opinion of the Chief Justice is not that G.S. 14-21 is inseparable but that it is separable and that the proviso is the surviving portion. This I find inconsistent with the legislative history of the statute, correctly set forth by Justice Huskins.

Chief Justice BOBBITT concurring in part and *dissenting* in part.

I agree with the majority's conclusion that "the *Furman* decision [*Furman v. Georgia,* 408 U.S. 238, 33 L.Ed. 2d 346, 92 S.Ct. 2726 (1972)] holds that the Eighth and Fourteenth Amendments will no longer tolerate the infliction of the death sentence if either judge or jury is permitted to impose that sentence as a matter of discretion." Under North Carolina statutes, whether the punishment for first degree murder, or rape, or burglary in the first degree, or arson, is to be death or life imprisonment depends solely on how the jury exercises its unbridled discretion.

Prior to *Furman,* this Court had sustained the convictions and death sentences in *State v. Miller,* 276 N.C. 681, 174 S.E. 2d 481 (1970); *State v. Hamby and Chandler,* 276 N.C. 674, 174 S.E. 2d 385 (1970); *State v. Chance,* 279 N.C. 643, 185 S.E. 2d 227 (1971); *State v. Westbrook,* 279 N.C. 18, 181 S.E. 2d 572 (1971); and *State v. Doss,* 279 N.C. 413, 183 S.E. 2d 671 (1971). On authority of *Furman,* the Supreme Court of the United States vacated the judgment(s) in each of these cases "insofar as it [left] undisturbed the death penalty imposed," and remanded the case to this Court for further proceedings. *Miller v. North Carolina,* 408 U.S. 937, 33 L.Ed. 2d 755, 92 S.Ct. 2863 (1972); *Hamby and Chandler v. North Carolina,* 408 U.S. 937, 33 L.Ed. 2d 754, 92 S.Ct. 2862 (1972); *Chance v. North Carolina,* 408 U.S. 940, 33 L.Ed. 2d 764, 92 S.Ct. 2878 (1972); *Westbrook v. North Carolina,* 408 U.S. 939, 33 L.Ed. 2d 761, 92 S.Ct. 2873 (1972); *Doss v. North Carolina,* 408 U.S. 939, 33 L.Ed. 2d 762, 92 S.Ct. 2875 (1972). Thereupon, this Court remanded each of these cases to the superior court which had tried it with direction that judgments imposing a sentence of life imprisonment be pronounced. *State v. Miller,* 281 N.C. 740, 190 S.E. 2d 841 (1972); *State v. Hamby and Chandler,* 281 N.C. 743, 191 S.E. 2d 66 (1972); *State v. Chance,* 281 N.C. 746, 191 S.E. 2d 65 (1972); *State v. Westbrook,* 281 N.C. 748, 191 S.E. 2d 68 (1972); *State v. Doss,* 281 N.C. 751, 191 S.E. 2d 70 (1972).

The decision on this appeal is that *Furman* requires that this Court vacate the death sentence and remand *this case* to the superior court for the pronouncement of judgment imposing a life sentence. I emphatically agree with this decision. Moreover, I do not think *any death sentence* may be constitutionally in-

flicted unless *our General Assembly* strikes from our present statutes the provisions which leave to the unbridled discretion of a jury whether the punishment shall be death or life imprisonment. In my opinion, this Court has no right to ignore, delete or repeal these provisions, which were put there by the General Assembly as an integral part of its plan for the punishment of crimes for which the death sentence was permissible. *Furman* did not repeal them. This Court has no right to repeal them.

While unnecessary to the disposition of this appeal, the majority opinion states the views of four members of this Court with reference to the conduct of trials and the sentencing of defendants in the future for crimes of murder in the first degree, rape, burglary in the first degree and arson *committed subsequent to the present decision*. Since the decision in *Furman*, several cases have been tried in our superior courts in which the defendants were convicted and sentenced to life imprisonment when the jury returned verdicts of guilty (no recommendation as to punishment being involved) and at least two cases in which upon a like verdict the defendant received a death sentence. My dissent is not directed to the fact that the majority are giving an advisory opinion or directive to our superior court judges with reference to crimes committed *subsequent to Furman*. Although the appeals in these cases will come to us in due course, I agree that our superior court judges are *now* entitled to some directive from this Court. *The ground on which I dissent is that the majority are giving what I consider to be the wrong advisory opinion or directive.*

The views expressed in the majority opinion *to which I dissent* may be summarized as follows: The *Furman* decision invalidates the portion of G.S. 14-21 which reads: "Provided, if the jury shall so recommend at the time of rendering its verdict in open court, the punishment shall be imprisonment for life in the State's prison, and the court shall so instruct the jury." The invalidation of this provision leaves intact that portion of the statute which precedes it and provides for punishment by death. The *Furman* decision does not invalidate the death penalty under present North Carolina statutes. It makes death the sole and exclusive punishment for rape. However, the death penalty is not to be imposed and carried out except for crimes committed subsequent to the filing of *this* decision.

If *Furman* had decided that the portion of G.S. 14-21 quoted above was separable and invalid and that death is now

the sole and exclusive punishment for rape, such decision would apply to all rapes committed subsequent to 29 June 1972, the date *Furman* was decided. But this was *not* the decision in *Furman. Furman* simply held that *the death penalty provision* of G.S. 14-21 as now constituted was invalid and that, absent amendment, no death sentence can be constitutionally imposed and carried out. The dismemberment of G.S. 14-21, and the declaration that death is the sole and exclusive punishment for rape, are neither required nor warranted by the decision in *Furman.*

Under Article XI, §§ 1 and 2, of the Constitution of North Carolina, the General Assembly is authorized to provide that the crimes of murder, rape, burglary and arson, and these only, may be punishable by death. Pursuant thereto, the General Assembly has enacted statutes which provide that a person convicted of first degree murder, G.S. 14-17, or of rape, G.S. 14-21, or of first degree burglary, G.S. 14-52, or of arson, G.S. 14-58, shall suffer death *unless* the jury, at the time of rendering its verdict in open court, recommends that the defendant's punishment shall be imprisonment for life in the State's prison.

There has been no change in any of the provisions of G.S. 14-17, G.S. 14-21, G.S. 14-52, and G.S. 14-58, since the enactment of Chapter 299, Session Laws of 1949, which contains the following: "Sec. 4. Section 14-21 of the General Statutes of North Carolina is hereby *rewritten* so as to read as follows:

"Sec. 14-21. Punishment for rape. Every person who is convicted of ravishing and carnally knowing any female of the age of twelve years or more by force and against her will, or who is convicted of unlawfully and carnally knowing and abusing any female child under the age of twelve years, shall suffer death: *Provided,* if the jury shall so recommend at the time of rendering its verdict in open court, the punishment shall be imprisonment for life in the State's prison, and the court shall so instruct the jury." (Our italics.)

Sections 14-17, 14-52 and 14-58 of the General Statutes were rewritten by sections 1, 2 and 3 of Chapter 299, Session Laws of 1949. As rewritten they prescribed in like manner the punishment for murder in the first degree, burglary in the first degree and arson, respectively.

Our General Assembly has provided that no death sentence can be pronounced unless (1) the jury is instructed that the

mandatory punishment will be death unless the jury when returning its verdict in open court recommends that the punishment be imprisonment for life in the State's prison, and unless (2) notwithstanding such instruction the jury returns a verdict of guilty and does not recommend that the punishment be imprisonment for life in the State's prison. Subsequent to the enactment of the 1949 Act, whether the punishment for murder in the first degree, or for rape, or burglary in the first degree, or for arson was to be death or life imprisonment was to be determined by juries, case by case, rather than by law applicable to all who committed crimes bearing those names. This Court consistently held that no constitutional right of a defendant was violated by provisions which authorized the jury, upon finding a defendant guilty of murder in the first degree, or of rape, or of burglary in the first degree or of arson, to determine whether the punishment was to be death or imprisonment for life, notwithstanding the absence from the statute of any standards to guide the jury in making that determination.

Notwithstanding our decisions upholding G.S. 14-17, G.S. 14-21, G.S. 14-52 and G.S. 14-58, the possibility that the Supreme Court of the United States would render a decision substantially like the decision in *Furman* had been anticipated. In the report submitted by the Judicial Council for consideration by the General Assembly of 1969, attention was called to this possibility. *If the General Assembly wished to continue the death penalty for the crime of rape,* it was recommended that G.S. 14-21 be amended by *striking the following:* "Provided, if the jury shall so recommend at the time of rendering its verdict in open court, the punishment shall be imprisonment for life in the State's Prison, and the court shall so instruct the jury." Similar recommendations were made with reference to G.S. 14-17 (first degree murder), G.S. 14-52 (first degree burglary) and G.S. 14-58 (arson). To implement these recommendations, bills were prepared and introduced. H.B. No. 136 (relating to rape, first degree burglary and arson), and H.B. No. 137 (relating to murder in the first degree), were referred to Judiciary Committee No. 2 of the House. Both received unfavorable reports. The General Assembly, although advised that the provision for the imposition of a death sentence might be held invalid, refused to prescribe death as the punishment for rape without providing for the alternative of life imprisonment if the jury so recommended.

H.B. No. 397 was introduced in the General Assembly of 1971. Section 2 thereof provided: "Sec. 2. G.S. 14-21 is hereby amended by striking the following words: 'shall suffer death: Provided, if the jury shall so recommend at the time of rendering its verdict in open court, the punishment shall be imprisonment for life in the State's prison.', and by inserting in lieu thereof the following words: 'shall suffer punishment by imprisonment for life in the State's prison.' " Sections 1, 3 and 4 of H.B. No. 397 provided for the amendment in like manner of the provisions of G.S. 14-17, G.S. 14-52 and G.S. 14-58 relating to punishment for murder in the first degree, burglary in the first degree and arson. H.B. No. 397 was referred to and (as amended) reported favorably by Judiciary Committee No. 2 but failed to pass the House on second reading.

The reasonable inference from the foregoing is that the General Assembly wanted G.S. 14-17, G.S. 14-21, G.S. 14-52 and G.S. 14-58 to remain exactly as they had been since 1949 and as upheld by the decisions *of this Court*. All provisions of G.S. 14-21 relate to the single subject indicated by the caption, to wit, "Punishment for rape." The provisions thereof constitute a single legislative plan. Only the *death penalty provision* was invalidated by *Furman.*

It is the decision of a majority of this Court—not the decision in *Furman*—which dismembers G.S. 14-21 and declares a particular portion thereof invalid and undertakes—in direct conflict with *Furman*—to validate the death penalty provision of G.S. 14-21 and adjudge that under present statutes death is the sole and exclusive punishment for rape. The main thrust of *Furman* is to restrict the circumstances in which capital punishment may be imposed. It is not only legally unsound but ironic and unrealistic to use *Furman* as a basis for holding that *hereafter under present statutes* death will be the sole permissible punishment for rape.

Whether the General Assembly *would have prescribed* death or life imprisonment if it had been confronted with the necessity of making that decision cannot be answered. In my view, this question must be answered now by the General Assembly rather than by this Court's speculation as to what the General Assembly at previous sessions would have done if they had been confronted with the necessity of making that decision.

The reliance placed by the majority on *United States v. Jackson,* 390 U.S. 570, 20 L.Ed. 2d 138, 88 S.Ct. 1209 (1968),

invites further consideration of that decision. In *Jackson,* the *death penalty provision* of the Federal Kidnapping Act (18 U.S.C. § 1201 (a)) was held *invalid* because it imposed an impermissible burden upon an accused's exercise of his Fifth Amendment right not to plead guilty and his Sixth Amendment right to demand a jury trial. In *Pope v. United States,* 392 U.S. 651, 20 L.Ed. 2d 1317, 88 S.Ct. 2145 (1968), based on *Jackson, the death penalty provision* of the Federal Bank Robbery Act (18 U.S.C. § 2113(e)) was held *invalid.* No other provision of either of these statutes was invalidated.

The provision for punishment by death "if the verdict of the jury shall so recommend" considered in *Jackson* was incorporated in the Federal Kidnapping Act when rewritten by the Act of May 18, 1934, 48 Stat. 781-82. The death penalty provision considered in *Pope* was a part of the original Federal Bank Robbery Act of May 18, 1934, 48 Stat. 783. Section 3 provided that the violation thereof "shall be punished by imprisonment for not less than 10 years, or by death if the verdict of the jury shall so direct." No statute *amending* or *rewriting the original Act* was involved.

Whether the death penalty provision was a part of the original act or incorporated by later amendment or rewriting was not the basis of decision in either *Jackson* or *Pope.* Moreover, the decisions in *Jackson* and *Pope* were not based upon the discretionary power granted to the jury. They were based upon the fact that Rule 23(a) of the Federal Rules of Criminal Procedure provided: "Cases *required to be tried by a jury* shall be so tried unless the defendant waives a jury trial in writing with the approval of the court and the consent of the Government." Under this rule, if a defendant was permitted to plead guilty or to waive a jury trial, he would thereby avoid the possibility of a death sentence.

In *State v. Anderson,* 281 N.C. 261, 188 S.E. 2d 336 (1972), the defendant appealed to this Court from a judgment which imposed death sentences based on verdicts of guilty of murder in the first degree (without recommendation of life imprisonment). The murders for which defendant was indicted and convicted were committed on 29 June 1971.

The opinion in *State v. Anderson, supra* at 267, 188 S.E. 2d at 340, states: *"Jackson* and *Pope* stand for the proposition that every defendant has a constitutional right to plead

not guilty and that the Federal Constitution does not permit the establishment of a death penalty applicable only to those defendants who assert their constitutional right to contest their guilt before a jury."

Chapter 616, Session Laws of 1953, codified as G.S. 15-162.1, provided in pertinent part as follows: "(a) Any person, when charged in a bill of indictment with the felony of murder in the first degree, or burglary in the first degree, or arson, or rape, when represented by counsel, whether employed by the defendant or appointed by the court under G.S. 15-4 and G.S. 15-5, may, after arraignment, tender in writing, signed by such person and his counsel, a plea of guilty of such crime; and the State, with the approval of the court, may accept such plea. . . . (b) In the event such plea is accepted, the tender and acceptance thereof shall have the effect of a jury verdict of guilty of the crime charged with recommendation by the jury in open court that the punishment shall be imprisonment for life in the State's prison; and thereupon, the court shall pronounce judgment that the defendant be imprisoned for life in the State's prison."

This Court, being of the opinion that the procedure authorized by G.S. 15-162.1 did not preclude a sentence of death after a conviction by a jury without recommendation of life imprisonment, upheld the convictions and death sentences in the following cases: *State v. Atkinson* (murder), 275 N.C. 288, 167 S.E. 2d 241 (1969); *State v. Hill* (murder), 276 N.C. 1, 170 S.E. 2d 885 (1969); *State v. Roseboro* (murder), 276 N.C. 185, 171 S.E. 2d 886 (1970); *State v. Sanders* (murder), 276 N.C. 598, 174 S.E. 2d 487 (1970); *State v. Williams* (murder), 276 N.C. 703, 174 S.E. 2d 503 (1970); *State v. Atkinson* (rape), 278 N.C. 168, 179 S.E. 2d 410 (1971).

Subsequently, based on *Jackson* and *Pope,* the Supreme Court of the United States reversed the judgments in these cases "insofar as [they] impose[d] the death sentence" and remanded the cases to this Court for further proceedings. *Atkinson v. North Carolina,* 403 U.S. 948, 29 L.Ed. 2d 859, 91 S.Ct. 2283 (1971); *Hill v. North Carolina,* 403 U.S. 948, 29 L.Ed. 2d 860, 91 S.Ct. 2287 (1971); *Roseboro v. North Carolina,* 403 U.S. 948, 29 L.Ed. 2d 860, 91 S.Ct. 2289 (1971); *Sanders v. North Carolina,* 403 U.S. 948, 29 L.Ed. 2d 860, 91 S.Ct. 2290 (1971); *Williams v. North Carolina,* 403 U.S. 948, 29 L.Ed. 2d

860, 91 S.Ct. 2290 (1971); *Atkinson v. North Carolina,* 403 U.S. 948, 29 L.Ed. 2d 861, 91 S.Ct. 2292 (1971).

Thereafter, this Court remanded each of these cases to the superior court where it was tried with directions that judgments imposing sentences of life imprisonment be pronounced. *State v. Atkinson,* 279 N.C. 386, 183 S.E. 2d 106 (1971); *State v. Hill,* 279 N.C. 371, 183 S.E. 2d 97 (1971); *State v. Roseboro,* 279 N.C. 391, 183 S.E. 2d 108 (1971); *State v. Sanders,* 279 N.C. 389, 183 S.E. 2d 107 (1971); *State v. Williams,* 279 N.C. 388, 183 S.E. 2d 106 (1971); *State v. Atkinson,* 279 N.C. 385, 183 S.E. 2d 105 (1971).

In the report submitted by the Judicial Council for consideration by the General Assembly of 1969, attention was called to the possibility that the Supreme Court of the United States would hold that a death sentence could not be imposed and carried out if a defendant could avoid the possibility of a death sentence by pleading guilty and thereby surrendering his right to jury trial. If the General Assembly wished to continue the death penalty, it was recommended that G.S. 15-162.1 be repealed. G.S. 15-162.1 was repealed by Chapter 117, Session Laws of 1969. It is here noted that G.S. 15-162.1 was not detached and invalidated by the decisions of the Supreme Court of the United States in the six cases referred to above.

As noted in *State v. Anderson, supra:* "[F]or some obscure reason, the General Assembly reenacted the provisions of G.S. 15-162.1 by Chapter 562 of the 1971 Session Laws, effective 15 June 1971. Then, apparently to correct the error, G.S. 15-162.1 was again repealed by enactment of Chapter 1225 of the 1971 Session Laws, effective 21 July 1971. It thus appears that from 15 June 1971 to 21 July 1971 the death penalty provisions of our statutes once again applied only to those defendants who asserted their right to plead not guilty. *United States v. Jackson, supra; Pope v. United States, supra; Atkinson v. North Carolina, supra.* Here, the murders were committed on 29 June 1971 while the provisions of G.S. 15-162.1 were in effect, and therefore the death sentences in these cases are unconstitutional and cannot be carried out. *Hill v. North Carolina, supra* [403 U.S. 948, 29 L.Ed. 2d 860, 91 S.Ct. 2287]." The murders having been committed when (reinstated) G.S. 15-162.1 was in effect, this Court vacated the death sentences and remanded the cases to the superior court for the pronouncements of judgments imposing sentences of life imprisonment.

From 1953 until the repeal of G.S. 15-162.1, North Carolina's legislative plan in respect of the death penalty was embodied in G.S. 14-17, G.S. 14-21, G.S. 14-52, G.S. 14-58 and in G.S. 15-162.1. Although enacted in 1953 as a separate statute, G.S. 15-162.1 was *in pari materia* with G.S. 14-17, G.S. 14-21, G.S. 14-52 and G.S. 14-58 as rewritten in 1949. Hence, G.S. 15-162.1 had to be considered as if its provisions were incorporated in G.S. 14-17, G.S. 14-21, G.S. 14-52 and G.S. 14-58 as rewritten in 1949. When the Supreme Court of the United States, on authority of *Jackson* and *Pope,* vacated the death sentences which this Court had upheld in *Atkinson, Roseboro, Sanders,* and *Williams,* it did not hold that G.S. 15-162.1 was invalid. As this Court recognized in *State v. Anderson, supra,* what the Supreme Court held was that so long as G.S. 15-162.1 remained a part of our legislative plan, no death sentence could be imposed or carried out. This objection could be and was removed by the repeal of G.S. 15-162.1. In like manner, the decision in *Furman* does not invalidate any particular clause of G.S. 14-17, G.S. 14-21, G.S. 14-52 or G.S. 14-58. It simply holds that no death sentence can be imposed and carried out as long as our statute contains provisions which leave to the unbridled discretion of a jury whether the punishment shall be death or life imprisonment.

The *Furman* decision was filed 29 June 1972. Its impact upon state statutes similar to our G.S. 14-17, G.S. 14-21, G.S. 14-52 and G.S. 14-58 was considered in the decisions discussed below.

In *State v. Johnson,* 31 Ohio St. 2d 106, 285 N.E. 2d 751 (1972), the jury found the defendant guilty of murder in the first degree and did not recommend mercy. His appeal from a death sentence was decided by the Supreme Court of Ohio on 19 July 1972. The pertinent portion of the Ohio statute provided: "Whoever violates this section is guilty of murder in the first degree and shall be punished by death unless the jury trying the accused recommends mercy, in which case the punishment shall be imprisonment for life." Ohio R.C. § 2901.01 (1954).

The following excerpts from the opinion of Justice Brown set forth the disposition of the appeal and the rationale of the Court's decision:

"The United States Supreme Court, in *Furman v. Georgia* . . . has held that the carrying out of a death penalty imposed

at the discretion of the trier of the facts constitutes cruel and unusual punishment in violation of the Eighth and Fourteenth Amendments to the United States Constitution.

"*Under that holding, which we are required to follow, the infliction of the death penalty under the existing law of Ohio is now unconstitutional* (with the possible exception of the taking of the life or attempting to take the life of the President, Vice President, or a person in the line of succession to the presidency [R.C. 2901.09], or of the Governor or Lieutenant Governor [R.C. 2901.10], which statutes purport to impose a mandatory penalty of death).

"We have reviewed the record of the proceedings in this case and find ample evidence of guilt of murder in the first degree.

\*        \*        \*

"It is our conclusion that, except as to the death sentence, the judgment of the Court of Appeals is affirmed. With regard to the death sentence, the judgment of the Court of Appeals must be modified and the sentence is reduced to life imprisonment, as prescribed in R.C. 2901.01."

In *Capler v. State,* Miss., 268 So. 2d 338 (1972), the defendant was convicted of murder and sentenced to suffer death. His conviction and sentence were affirmed by the Supreme Court of Mississippi, which also denied his petition for a rehearing. The Supreme Court of the United States granted his petition for certiorari and ordered "that the judgment of the Supreme Court of Mississippi in this case be vacated insofar as it leaves undisturbed the death penalty imposed and that this cause be remanded to the Supreme Court of the State of Mississippi for further proceedings." *Capler v. Mississippi,* 408 U.S. 937, 33 L.Ed. 2d 754, 92 S.Ct. 2862 (1972). This order and mandate followed the decision in *Furman.*

The pertinent Mississippi statute provided: "Every person who shall be convicted of murder shall suffer death, unless the jury rendering the verdict shall fix the punishment at imprisonment in the penitentiary for the life of the convict; or unless the jury shall certify its disagreement as to the punishment as provided by section 1293 [Code of 1930; § 2536, Code of 1942] in which case the court shall fix the punishment at imprisonment for life." Miss. Code of 1942, § 2217 (1957). Upon further consideration, the Supreme Court of Mississippi remanded the

case to the trial court for the pronouncement of a judgment of life imprisonment. The rationale of this decision is empitomized by Chief Justice Gillespie in these words: "The only infirmity in section 2217 is that the harsher penalty of death may not lawfully be imposed. The remaining part of the statute is complete, and it does not follow that the remaining provision providing for imprisonment in the penitentiary for the life of the defendant must fall. We hold that because of the decision in *Furman v. Georgia* the death penalty cannot be inflicted; that the remainder of the statute is valid, and the only other punishment for murder is life imprisonment." *Accord, Peterson v. State,* Miss., 268 So. 2d 335 (1972).

In *State v. Square,* La., 268 So. 2d 229 (1972), the defendant's conviction of murder and the death sentence pronounced thereon had been affirmed by the Supreme Court of Louisiana but the Supreme Court of the United States, citing *Stewart v. Massachusetts,* 408 U.S. 845, 33 L.Ed. 2d 744, 92 S.Ct. 2845 (1972), following *Furman v. Georgia,* vacated the judgment insofar as it left undisturbed the death penalty imposed and remanded the case for further proceedings. 408 U.S. 938, 33 L.Ed. 2d 760, 92 S.Ct. 2871 (1972). The pertinent portion of the Louisiana statute provided: "In a capital case the jury may qualify its verdict of guilty with the addition of the words 'without capital punishment,' in which case the punishment shall be imprisonment at hard labor for life." L.S.A.C.Cr.P. art. 817 (1967).

Upon consideration upon remand, the per curiam opinion of the Supreme Court of Louisiana contains the following:

"We construe the Mandate of the United States Supreme Court to require the imposition of a sentence other than death. Cf., *State v. Shaffer,* 260 La. 605, 257 So. 2d 121 (1971) and *State v. Duplessis,* 260 La. 644, 257 So. 2d 135 (1971).

"Accordingly, in compliance with the Mandate of the United States Supreme Court, the death sentence imposed upon defendant is annulled and set aside, and the case is remanded to the 4th Judicial District Court with instructions to the trial judge to sentence the defendant to life imprisonment.

"Case remanded."

In *Garcia v. State,* 501 P. 2d 1128 (Okla. Crim. 1972), the jury found the defendant guilty of murder and fixed his

punishment at death. The pertinent Oklahoma statute provided: "Every person convicted of murder shall suffer death, or imprisonment at hard labor in the State penitentiary for life, at the discretion of the jury. Upon trial of an indictment for murder, the jury, if they find the defendant guilty, must designate in their verdict whether he shall be punished by death or imprisonment for life at hard labor, and the judgment of the court shall be in accordance therewith. But upon a plea of guilty the court shall determine the same." 21 Okla. Stat. Ann. § 707 (1958). On 21 June 1972, the Court of Criminal Appeals of Oklahoma affirmed the conviction and death sentence. However, that decision was modified 26 October 1972, on rehearing, at which time the following order was entered: "In the light of *Furman v. Georgia, Jackson v. Georgia,* and *Branch v. Texas* . . . the judgment and sentence of death by electrocution is modified to a term of life imprisonment, and as so Modified, the judgment and sentence is Affirmed." 501 P. 2d at 1141.

In *People v. Speck,* Ill., 287 N.E. 2d 699 (1972), the jury found the defendant guilty of murder in each of eight cases. His convictions and the death sentences pronounced thereon were affirmed by the Supreme Court of Illinois. However, the Supreme Court of the United States reversed each judgment insofar as it imposed a death sentence.

The pertinent portions of the Illinois statutes (S.H.A. ch. 38 (1972)) are quoted below:

"§ 9-1. *Murder*

\*    \*    \*

"(b) Penalty.

"A person convicted of murder shall be punished by death or imprisonment in the penitentiary for any indeterminate term with a minimum of not less than 14 years. If the accused is found guilty by a jury, a sentence of death shall not be imposed by the court unless the jury's verdict so provides in accordance with Section 1-7 (c) (1) of this Code."

\*    \*    \*

"§ 1-7. *Judgment, Sentence and Related Provisions*

\*    \*    \*

"(c) Capital Offenses.

"(1) Where, upon a trial by jury, a person is convicted of an offense which may be punishable by death, the jury may return a verdict of death. Where such verdict is returned by the jury, the court may sentence the offender to death or to imprisonment. Where such verdict is not returned by the jury, the court shall sentence the offender to imprisonment."

Upon remand of the *Speck* case, Justice Schaefer, speaking for the Supreme Court of Illinois, said: "The Supreme Court has now held that a defendant could not be validly sentenced to death under the same Illinois statutes that are applicable to this case. *(Moore v. Illinois* (1972), \_\_\_\_\_ U.S. \_\_\_\_\_, 92 S.Ct. 2562, 33 L.Ed. 2d 706; *Furman v. Georgia.* . . . ) Therefore, the death penalty cannot be reimposed on the defendant, and the only remaining question is the procedure to be followed in resentencing him to a sentence other than death."

In *Commonwealth v. Bradley,* Pa., 295 A. 2d 842 (1972), the jury found the defendant guilty of murder in the first degree and fixed the penalty at death. On direct appeal, the conviction was affirmed but the death sentence was vacated and the *defendant was sentenced to life imprisonment.* The pertinent portion of the Pennsylvania statute provided: "Whoever is convicted of the crime of murder of the first degree is guilty of a felony and shall be sentenced to suffer death in the manner provided by law, or to undergo imprisonment for life, at the discretion of the jury trying the case, which shall, in the manner hereinafter provided, fix the penalty." 18 Pa. Stat. Ann. § 4701 (1963). The ground of decision was stated by Justice Roberts as follows: "In *Furman v. Georgia,* . . . the United States Supreme Court recently held *that the imposition of the death penalty under statutes such as the one pursuant to which the death penalty was imposed upon appellant is violative of the Eighth and Fourteenth Amendments.* Accordingly, appellant's sentence of death may not now be imposed." 295 A. 2d at 845. (Our italics.) *Accord, Commonwealth v. Sharpe,* Pa., 296 A. 2d 519 (1972) ; *Commonwealth v. Lopinson,* Pa., 296 A. 2d 524 (1972) ; *Commonwealth v. Ross,* Pa., 296 A. 2d 629 (1972).

In *Graham v. State,* Ark., 486 S.W. 2d 678 (1972), the jury found the defendant guilty of murder in the first degree and did not recommend a life sentence. The pertinent Arkansas statute provided: "The jury shall have the right in all cases where the punishment is now death by law, to render a verdict

of life imprisonment in the State penitentiary at hard labor."
Ark. Stat. Ann. § 43-2153 (Repl. 1964). Upon defendant's
appeal, the Supreme Court of Arkansas upheld the conviction
but remanded the case to the trial court for the pronouncement
of a judgment of life imprisonment. The following excerpt from
the opinion of Justice Byrd indicates the ground of decision:
"[T]he U. S. Supreme Court, as presently constituted, has
recently decided that where a jury is permitted to decide be-
tween the punishments of life and death, the death penalty
constitutes 'cruel and unusual punishment' and that such inter-
pretation is applicable to the several states through the Four-
teenth Amendment. See *Furman v. Georgia.* . . .

"So long as the ruling in *Furman v. Georgia, supra,* is made
applicable to this State, we are obliged to reduce appellant's
sentence from death to life imprisonment as being the next
highest available penalty, Ark. Stat. Ann. § 43-2308 (Repl.
1964)." 486 S.W. 2d at 679.

In *State v. Baker,* Wash., 501 P. 2d 284 (1972), the jury
found defendant guilty of murder in the first degree and asked
that the death penalty be inflicted. The pertinent portion of
the Washington statute provided: "Murder in the first degree
shall be punishable by imprisonment in the state penitentiary
for life, unless the jury shall find that the punishment shall be
death. . . . " R.C. Wash. Ann. § 9.48.030 (1961). Notwithstand-
ing the jury's request, the trial judge deferred imposition of
the death penalty on the condition that the defendant be incar-
cerated for life not subject to parole. The case was before the
Supreme Court of Washington on the State's appeal from that
order. In remanding the case for a proper sentence in the light
of *Furman,* the Court said: "The decision in *Furman* has ren-
dered the issue presented here moot *since the state is now pre-
cluded from any attempt to have the death penalty imposed
under the existing statute.* The question whether a trial court
may defer the death penalty has become academic." *Id.* at
284-85. (Our italics.)

In *Huggins v. Commonwealth,* Va., 191 S.E. 2d 734 (1972),
the jury found the defendant guilty of first degree murder and
fixed his punishment at death. The pertinent statute provided:
"Murder of the first degree shall be punished with death, or
by confinement in the penitentiary for life, or for any term
not less than twenty years." Va. Code 1950 § 18.1-22. Based on
*Furman,* Justice Poff, for the Supreme Court of Virginia, said:

"Insofar as it authorized discretionary imposition of the death penalty, Virginia's statute is unconstitutional. With respect to the death sentence, the judgment is vacated." *Id.* at 735. The conviction was upheld and the case was remanded for a new trial on the issue of punishment, that is, to determine whether the confinement in the penitentiary was to be for life, or for a term of twenty years, or for a term exceeding twenty years. *Accord, Hodges v. Commonwealth,* Va., 191 S.E. 2d 794 (1972).

Although the above-cited decisions in which death sentences were reversed and sentences of life imprisonment were substituted therefor involved crimes committed prior to *Furman,* none suggests that a death sentence may be imposed and carried out unless and until present statutory provisions are amended. All either state or clearly imply that under existing statutes the death sentence may not be imposed and carried out without regard to whether the crime was committed before or subsequent to *Furman.*

The Florida, Louisiana and Pennsylvania cases discussed below relate to current and future problems of procedure because of unequivocal holdings that under existing statutes a death penalty cannot be imposed and carried out.

In *Donaldson v. Sack,* 265 So. 2d 499 (Fla. 1972), Donaldson, who had been indicted for murder in the first degree, filed his petition in the Supreme Court of Florida for a writ of prohibition. Fla. Const. Art. V, § 9(2), vested in the criminal courts of record jurisdiction of "all criminal cases not capital." Fla. Const. Art. V, § 6(3), vested in the circuit courts "all criminal cases not cognizable by subordinate courts." Donaldson asserted that respondent, Circuit Court Judge Sack, had no jurisdiction to proceed with his case because, as a result of the decision in *Furman,* "capital cases" no longer existed in Florida.

On 29 June 1972, when *Furman* was decided, Florida statutes then in force included the following:

"The unlawful killing of a human being, when perpetrated from a premeditated design to effect the death of the person killed or any human being, or when committed in the perpetration of or in the attempt to perpetrate any arson, rape, robbery, burglary, abominable and detestable crime against nature or kidnapping, shall be murder in the first degree and shall constitute a capital felony, punishable as provided in § 775.082." Fla. Stat. Ann. § 782.04(1) (1972 Supp.).

"Whoever ravishes and carnally knows a female of the age of ten years or more by force and against her will, or unlawfully or carnally knows and abuses a female child under the age of ten years, shall be guilty of a capital felony, punishable as provided in § 775.082. . . . " Fla. Stat. Ann. § 794.01 (1972 Supp.).

"A person who has been convicted of a capital felony shall be punished by death unless the verdict includes a recommendation to mercy by a majority of the jury, in which case the punishment shall be life imprisonment. A defendant found guilty by the court of a capital felony on a plea of guilty or when a jury is waived shall be sentenced to death or life imprisonment, in the discretion of the court." Fla. Stat. Ann. § 775.082(1) (1972 Supp.).

A Florida statute which became effective 1 October 1972, and is now codified as section 775.082(2) and (3), provided: "(2) In the event *the death penalty* in a capital felony is held to be unconstitutional by the Florida Supreme Court or the United States Supreme Court, a person who has been convicted of a capital felony shall be punished by life imprisonment.

"(3) In the event *the death penalty* in a capital felony is held to be unconstitutional by the Florida Supreme Court or the United States Supreme Court, the court having jurisdiction over a person previously sentenced to death for a capital felony shall cause such person to be brought before the court, and the court shall sentence such person to life imprisonment with no eligibility for parole." (Our italics.)

Exerpts from the opinion of Judge Dekle are quoted below.

"Since *Furman v. Georgia* . . . in effect 'removes' (until new legislation which may revive it) 'capital cases,' then there appears to be no logical escape from the fact that our circuit courts at this time, and until any legislation which may revive 'capital cases,' do not have jurisdiction in those cases heretofore delineated as 'capital' and accordingly subsequent to *Furman* jurisdiction in such cases now pending or being filed vests in the courts of record and may be transferred there in those 17 counties of Florida which have such courts."

"We are unable in the face of existing authorities and logic to find support for the continuance of 'capital offense' as heretofore applied. Accordingly, it must fall with the U. S. Supreme

Court's holding against the death penalty as provided under present legislation. Our decision is compelled by that Court's action."

"We find no difficulty with a continuation of the *sentencing* for these former 'capital offenses' under § 775.082(1) as automatically life imprisonment upon conviction, inasmuch as that is the only offense left in the statute. . . . The elimination of the death penalty from the statute does not of course destroy the entire statute. We have steadfastly ruled that the remaining consistent portions of statutes shall be held constitutional if there is any reasonable basis for doing so and of course this clearly exists in these circumstances."

"The removal of capital punishment only removes 'capital cases' as that term has been known. The *offense*—and the imposition of a life sentence upon conviction—remains. . . . There simply is not at this time such a designation as a 'capital case' as set forth in the several provisions of our Constitution, statutes and rules."

Since there were no "capital cases" under existing Florida statutes, the court then discusses the drastic impact of its decision upon Florida's Criminal Rules relating to (1) the requirement of twelve jurors in a "capital case," (2) provisions for a speedy trial, (3) jury selection procedures, (4) bifurcated trial procedures, (5) necessity for indictment by a grand jury, and (6) right to bail.

In *Anderson v. State,* 267 So. 2d 8 (Fla. 1972), the Supreme Court of Florida, based on *Furman,* vacated the death sentences of forty defendants. It corrected the sentences of those who had been convicted of murder in the first degree by providing that each be imprisoned for the term of his natural life. In doing so, the Court said: "The elimination of the death penalty from the statute prescribing the penalty for murder in the first degree does not destroy the whole statute. The only sentence which can now be imposed upon conviction of the crime of murder in the first degree is life imprisonment. This is an automatic sentence and a reduction from the sentence previously imposed. The Court has no discretion." The defendants in the rape cases having been convicted for rapes committed prior to 1 January 1972, were subject to imprisonment for life *or* for any term of years within the discretion of the Court. Fla. Stat.

Ann. § 794.01 (1944). Their cases were remanded for re-sentencing.

On authority of *Donaldson* and *Anderson, supra,* the Supreme Court of Florida in *State v. Whalen,* 269 So. 2d 678 (Fla. 1972), held that a trial judge, sitting as sole trier of fact after accepting a plea of guilty to first degree murder and holding an evidentiary hearing on the issue of the extent of penalty, did not have power to impose the death sentence. Chief Justice Roberts said: "This question concerning bifurcated trials is moot since at the present time capital punishment may not be imposed. This Court has held that there are currently no capital offenses in the State of Florida. If there is no capital offense, there can be no capital penalty." *Id.* at 679.

In *Ex Parte Contella,* 485 S.W. 2d 910 (Tex. Crim. 1972), the appeals were from orders in habeas corpus proceedings in which the accused were denied bail after indictment for murder with malice. The Texas Constitution contained this provision: "All prisoners shall be bailable by sufficient sureties, unless for capital offenses, when the proof is evident. . . . " A Texas statute provided: "All prisoners shall be bailable unless for capital offenses when the proof is evident." A capital felony was defined by statute as "[a]n offense for which the highest penalty is death." The cited Texas decisions had held that "[t]he term 'proof is evident' means the accused, with cool and deliberate mind and formed design, maliciously killed the deceased, and that upon a hearing of the facts before the court a dispassionate jury would, upon such evidence, not only convict but would assess the death penalty." Vernon's Ann. P.C. art. 1257 provides: "The punishment for murder shall be death or confinement in the penitentiary for life or for any term of years not less than two." Vernon's Ann. C. Crim. Proc. art. 37.07 (1972 Supp.) provides that, in capital cases, where the state has made it known in writing prior to trial that it will seek the death penalty, the punishment must be assessed by the jury.

The following excerpts from the opinion of Judge Roberts set forth the disposition of the appeals and the rationale of the decision.

"In the case of *Furman v. Georgia* . . . the United States Supreme Court held that the death penalty, at least insofar as it is currently imposed in this country, 'constitutes cruel and

State v. Waddell

unusual punishment in violation of the Eighth and Fourteenth Amendments.' That being the case, we conclude that the death penalty, as it is currently authorized, may not be imposed as a penalty for the crime of murder.

"In light of this holding, the question which is before the Court is whether, in terms of our Constitution and statute, bail may now be denied in cases in which, prior to the holding in *Furman v. Georgia, supra,* the death penalty could have been imposed. We conclude that bail may not be denied in such cases.

\*       \*       \*

"We therefore conclude that bail may no longer be denied on the ground that the offense is a capital offense and the proof is evident. Since the death penalty may not be imposed, there no longer exists a 'capital felony' as defined in Art. 47, V.A.P.C. Likewise, since the death penalty is no longer a possible penalty, it is impossible for the State to offer evidence, in this or any other case, sufficient to establish that the 'proof is evident' as that term is defined in *Ex parte Paul, supra.* Therefore, there is no case in which bail may be denied under the provisions of Art. 1, Section 11 of the Texas Constitution or Art. 1.07, V.A.C.C.P.

"The orders denying bail are reversed and the trial judge is ordered to set bail herein." 485 S.W. 2d at 911-912.

In *Commonwealth v. Truesdale,* Pa., 296 A. 2d 829 (Nov. 1972), the defendant was awaiting trial on indictments of first degree murder and conspiracy. Under the Pennsylvania Constitution a "capital" offense is not bailable and defendant had been denied bail. After the decision in *Furman,* defendant made an application for his release on bail on the ground that *Furman* abolished the death penalty as it theretofore had existed in Pennsylvania. After a hearing, the trial court granted bail. The Commonwealth immediately filed a petition in the Supreme Court requesting the assumption of plenary jurisdiction to determine whether defendant had a right to bail pending trial. The Court observed that "[w]ith the decision of the United States Supreme Court in *Furman v. Georgia . . .* as well as this Court's decision in *Commonwealth v. Bradley,* Pa., 295 A. 2d 842 (1972), *which cases have invalidated the death penalty as it presently exists in Pennsylvania,* we are left to decide if the definition of 'capital offense' which we adopted in *Alberti*

requires that the the bail set for Truesdale was proper." 296 A. 2d at 832 (Our italics.) Holding that bail was properly granted, the Court stated that "since there are presently no criminal offenses in the Commonwealth for which the death penalty may be imposed, there are no 'capital offenses'; hence, by mandate of our Constitution, all offenses are bailable prior to trial." *Id.* The Court clearly recognizes and accepts the fact that the effect of the *Furman* decision was to make "the maximum penalty for murder in the first degree . . . life imprisonment." 296 A. 2d at 835.

In *State v. Holmes,* La., 269 So. 2d 207 (1972), and in *State v. Flood,* 269 So. 2d 212 (La. Nov. 1972), the Supreme Court of Louisiana held that *Furman* did not destroy the classification of certain crimes in Louisiana as capital offenses. The impact of *Furman* was described in these words: "The crime [of murder] remains unchanged; only the penalty has been changed. True, the penalty is what made murder a capital offense, and is not actually a capital offense in Louisiana today. But the *nature* of the offense has not changed—only the punishment." *State v. Flood, supra* at 214. Hence, *Holmes* held that a person charged with a crime formerly punishable by death had to be tried by a jury of twelve, all of whom must concur to render a verdict; and *Flood* held that a person so charged was not entitled *as of right* to be released on bail.

The majority opinion cites *State v. Dickerson,* Del. Supr., 298 A. 2d 761 (Nov. 1972). This is the only decision disclosed by our research which supports to any extent the view of the majority herein. Dickerson was charged with a first degree murder committed prior to the decision in *Furman.* Two questions of law were certified by the Superior Court to the Supreme Court, to wit: "1. Are the discretionary mercy provisions of 11 *Del.C.* § 3901 unconstitutional under *Furman v. Georgia?* 2. If the answer to Question 1 is yes, is the mandatory death penalty prescribed in 11 *Del.C.* § 571 constitutional?" Both questions were answered "Yes."

11 Del.C. § 571 provided that whoever committed the crime of first degree murder as defined therein "shall suffer death." 11 Del.C. § 3901 provided: "In all cases where the penalty for crimes prescribed by the laws of this state is death, if the jury, at the time of rendering their verdict, recommends the defendant to the mercy of the Court, the Court may, if it seems proper

State v. Waddell

to do so, impose the sentence of life imprisonment instead of death."

The questions certified seem to have been adroitly phrased to elicit the answers which were given. The true question was whether *Furman* had invalidated the death penalty provision of the Delaware statute. All justices (3) of the Supreme Court of Delaware concurred in answering the certified questions as stated above. The majority (2) held that the death penalty could not be applied retroactively to the defendant in the case under consideration. This is an excerpt from the majority opinion: "Having determined that the mandatory death penalty provision of the Murder Statute, standing alone, may not be applied retroactively, we are left with the problem of pointing to the statutory, common law, or inherent power of the Superior Court under which the sentence may be imposed upon a conviction of murder in the first degree for which the mandatory death penalty of the Murder Statute may not be imposed. That question was not certified and was not briefed or argued by counsel." Chief Justice Wolcott dissented from "the majority's conclusion that 11 *Del.C.* § 571 may not be applied retroactively by the courts of this State." His dissent is based on this premise: "The Supreme Court of the United States— not this Court—has held that the Mercy Statute is unconstitutional. We, of course, are bound by this decision, but we have not made it." Suffice to say, in my view *Furman* held only that *the death penalty provision* of the Delaware statute was invalid. Therefore, as I see it, the holdings of the Supreme Court of Delaware in Dickerson were not required or supported by *Furman.*

I agree that the *Furman* decision has not established the proposition that capital punishment under all circumstances constitutes cruel and unusual punishment in violation of the Eighth and Fourteenth Amendments to the Constitution of the United States. Moreover, nothing in the *Furman* decision would seem to invalidate a statute of our General Assembly prescribing death as the sole and exclusive punishment for murder in the first degree, rape, burglary in the first degree, or arson. Whether such a statute should be enacted is for legislative determination. The majority opinion states: "We recognize that the Legislature, not the Courts, decides public policy, responds to public opinion and, by legislative enactment, reflects society's standards. The matter of retention, modification or abolition of

the death penalty is a question for the law-making authorities rather than the courts." With this statement I emphatically agree. However, in their directive that death shall be the sole and exclusive punishment for all crimes of first degree murder, rape, first degree burglary, and arson, committed *after the filing of this decision,* the majority, in my view, have assumed to act in a legislative rather than in a judicial capacity. Thereby they demonstrate the difference between precept and practice. Of course, the practical effect of today's decision is to place upon those members of the General Assembly who favor the abolition or limitation of capital punishment the burden of initiating and passing legislation to that effect.

It is my view that, unless and until G.S. 14-17, G.S. 14-21, G.S. 14-52, and G.S. 14-58 are amended by our General Assembly, *Furman* requires that trials be conducted solely to determine the guilt of the defendant; and, if found guilty of murder in the first degree, rape, burglary in the first degree, or arson, that the defendant be sentenced to life imprisonment as the only permissible punishment.

Justice HIGGINS concurring in result.

A Court opinion must reflect the views of the majority of the Court. A concurring in result opinion may reflect the individual views of the writer.

In my opinion, *Furman v. Georgia,* 408 U.S. 238, 33 L.Ed. 2d 346, does not work any change in North Carolina trial procedure. The decision deals with punishment only. Hence in what are now our four capital felonies the trial court should, as in other cases, omit any reference to punishment and charge on the constituent elements of the offenses and instruct the jury under what circumstances a verdict of guilty should be returned. As a result of the Court's holding in *Furman,* a charge on the right of the jury to recommend life imprisonment is now an idle gesture and should be omitted. The recommendation is not authorized until the jury unequivocally finds guilt. A conviction without a jury recommendation now requires life imprisonment and permits nothing more.

After discussing the effect of the 1949 amendment giving the jury power to recommend life imprisonment in our four capital felony cases, the majority opinion concludes: "It is the proviso, and the proviso alone, which creates the discretionary

difficulty condemned by the *Furman* decision; and it is quite clear that *Furman* strikes down the proviso as violative of the Eighth and Fourteenth Amendments."

I do not so interpret the effect of *Furman*. That decision does not strike down the proviso and does not hold that it violates the Eighth and Fourteenth Amendments. *Furman* holds that after the jury determines guilt and the State law permits either the court or the jury discretion whether the punishment shall be death or life imprisonment, life imprisonment must be imposed. Where discretion is given, *Furman* holds that a life sentence is valid but strikes down the death penalty. The rationale of the rule seems to be that if discretion between a death sentence or life imprisonment is given either to the court or the jury, the milder punishment must be imposed because in the interpretation of criminal statutes that which is the more favorable to the accused must be accepted.

The fixing of punishment for crime is a legislative function. The General Assembly, in my view, may fix death as the punishment for either or all of the four offenses named in Article XI, Section 2 of the North Carolina Constitution. The Legislature may provide the death penalty or it may provide life imprisonment, but when it undertakes to give an option, the milder judgment must be imposed.

In my opinion, this Court can no more strike out the proviso for life imprisonment than it can strike out the death penalty. Both provisions were inserted in the law by the General Assembly. I am unfamiliar with any authority this Court has to legislate on the subject by repealing either provision.

This further objection to the opinion: After the Court has "eliminated" the right of the jury to recommend life imprisonment in this case, the Court further decrees that capital punishment shall be restored after this Court's opinion is handed down. This holding seems to be required in order that the Court may dig itself out of the hole it fell into by its holding that *Furman* "strikes down the proviso as violative of the Eighth and Fourteenth Amendments." *Furman*, as I understand it, holds that life imprisonment is valid, but because of the option, *Furman* strikes down the death penalty.

Since writing the above I have read the well documented opinion of the Chief Justice. I fully concur therein.

---

---

Justice SHARP concurring in the opinion of Chief Justice Bobbitt:

I concur fully with the views expressed by the Chief Justice in his well-documented opinion and in his conclusion that the effect of *Furman* is to invalidate the death penalty under the laws of this State as presently written and to make life imprisonment the punishment for first degree murder, rape, arson, and first degree burglary. In signifying my concurrence I add these comments:

In my view, there are no constitutional infirmaties in capital punishment *per se* and, under the conditions prevailing today, I do not consider the death penalty cruel and unusual punishment for the crimes for which the State Constitution authorizes the General Assembly to prescribe it. Thus, were I to permit my personal views on capital punishment as a State policy to dictate my decision in this case, I would have voted with the majority. This, however, I am not at liberty to do.

The majority decision is based upon the supposition that in 1949, when the legislature *rewrote and re-enacted* G.S. 14-21, it would have left the statute unchanged had it known the United States Supreme Court would invalidate the death penalty as authorized in the rewritten section. With all deference, I do not attribute to the majority such occult powers. They cite the failure of seventeen bills or resolutions introduced in the General Assembly to abolish or limit capital punishment. However, they fail to mention the similar fate of the two Judicial Council bills which, in 1969 and 1970, sought to repeal the power of commutation which the legislature had given the jury trying a capital case and to make the death sentence mandatory for the four crimes. In short, the legislature rejected the proposal that capital punishment be retained without the discretionary power in the trial jury to determine whether the convict's sentence should be death or life imprisonment.

The question of capital punishment is one of high public policy, and the constitutional mandate is that it shall be determined by the legislature—not by the judiciary. N. C. Const. art. I, § 6 declares: "The legislative, executive, and supreme judicial powers of the State government shall be forever separate and distinct from each other." The history of the Supreme Court of North Carolina has been one of judicial restraint and strict adherence to the doctrine of the separation of powers. Our opinions abound with declarations that public policy is the exclusive

province of the legislature and its determination is not subject to judicial review; and that the wisdom or impolicy of the law is solely for the legislature and we have neither the power nor the desire to usurp its prerogative. *See* 2 North Carolina Digest *Const. Law* §§ 6, 10 (1967) and cases cited therein.

This Court, which has consistently deplored the encroachment of other courts upon the legislative prerogatives during the past decade, now follows suit and sets its own example of judicial overreaching by changing the penalty for rape, first degree murder, arson and first degree burglary "from death or life imprisonment in the discretion of the jury to mandatory death." The majority concede that this is "an upward change of penalty" which cannot be applied retroactively. Thus, while giving lip service to the doctrine of separation of powers, this Court does today what the legislatures of 1969 and 1971 declined to do. Had this action been taken by the General Assembly, I would have neither legal nor personal objections. However, when the Court takes such action, in my view, it violates fundamental constitutional principles. I therefore dissent from the conclusion reached by the majority in the advisory opinion.